PEDER LARSEN

*v.*

JOHN PETERSON.

1. A water-pipe leading from a driven well in a yard, to a sink in the kitchen of a dwelling, there ending in a pump, by which water can be, and is, habitually drawn from the well to the kitchen for domestic purposes—the well and water-pipe being completely hidden from view—form an apparent and continuous easement, which will pass with a conveyance of the dwelling alone by the owner of both yard and house, the owner retaining the yard.

2. The same result will follow a simultaneous conveyance by the owner of both tenements, of the house to one person and of the yard and well to another, provided the grantee of the yard and well has notice of the existence of the connection between the well and the pump and of the other conveyance, and such conveyance is made by his consent.

Heard on pleadings and proofs.

*Mr. Edwin B. Goodell,* for the complainant.

*Mr. Scott German,* for the defendant.

PITNEY, V. C.

The object of this bill is to establish and protect complainant's right in, and enjoyment of, an easement.

The circumstances, which are not open to serious dispute, are peculiar. For some years prior to and on the 1st day of June, 1893, Mrs. Elizabeth Mabey, of Montclair, Essex county, was the owner of a lot of land fronting on Elmwood avenue, in that city, upon which was a double frame dwelling, comprising, under one roof, two complete dwellings, separated only by an ordinary lath and plaster partition, without any openings. Some years before that date she had procured a well to be drilled in the earth and underlying water-bearing rock in the rear of this building, and had laid therefrom two independent water-pipes placed in the earth, leading to the dwelling, one into the sink of each kitchen. Each dwelling was supplied with an ordinary hand-pump, and in this manner, and in no other way, each of the separate dwellings was supplied with water. There was nothing visible on the ground in the rear of the house to indicate the existence of a well or its connection with the dwelling, and there was no water-main in the street.

This being the situation, Mrs. Mabey, in the spring of 1893, was minded to sell this property, but was unwilling to sell a part without the whole. At the same time, both complainant and defendant were desirous of purchasing houses for their individual use, and, hearing of this property, called together on Mrs. Mabey—that is, complainant and John Peterson, acting as agent for his wife—and looked at the property. They looked at only one of the dwellings—that in the actual occupation of Mrs. Mabey, the other being in the occupation of a tenant—and were informed, and truly, by Mrs. Mabey, that the two dwellings were precisely alike in all respects, and,

indeed, this was plainly indicated by their exterior appearance. In the kitchen of the part occupied by Mrs. Mabey, both complainant and Peterson saw and particularly noticed the pump in the sink and tasted the water from it, and were informed that it came from a drilled well in the back yard, and that both dwellings were supplied in the same way and from the one well. The precise location of the well was not pointed out, and was not known either to Mrs. Mabey or to either of the parties until after the conveyances presently to be mentioned. Both complainant and defendant knew that there was no water-main in the street. On that occasion complainant and John Peterson agreed together, and with Mrs. Mabey, to purchase the property at a price named, and agreed that it should be equally divided between them, and that the title should be made to each in severalty according to a dividing line to be agreed upon between them and actually run on the ground by a surveyor in such a manner that it should run through the partition separating the two dwellings, and then divide the land as nearly equally as practicable. Peterson at the same time gave $10 for the choice of the houses, and then and there chose the house in which Mrs. Mabey was living; but such choice had no reference to the location or control of the well, and was influenced entirely by the circumstance that the house so chosen had, owing to the shape of the lot, more light and air in its front and side than the other. The survey was had accordingly, and a description of the dividing line given, and deeds of conveyance in accordance with it, dated June 1st, 1893, were executed by Mrs. Mabey on June 5th, and duly delivered at the same moment, one to complainant and the other to Mrs. Peterson, the wife of John. Both parties took possession. Subsequently Peterson discovered that the well was on his land, and then cut off the pipe leading to complainant's kitchen, who thereupon attempted to repair it and was prevented by the defendant; whereupon he filed this bill asking that his rights in the premises may be established, and the defendant enjoined from preventing him from renewing the water-pipe connection with the well. Upon the filing of the bill an injunction was granted accordingly, and the complainant

took advantage of it to restore the connection between his pump and the well to its former condition.

At the hearing there was no contention that the well did not supply water enough for both families, or that complainant had made an unreasonable use of it.

The above are the facts as I have found them. Peterson does, indeed, deny that he was told on the occasion in question that the other dwelling had a pump like the one they inspected, or that there was but one well for both houses. But the contrary is supported not only by the evidence of complainant, but also by that of Mrs. Mabey and her daughter, both disinterested witnesses—or rather, if they have any interest, it is against complainant, since Mrs. Mabey gave Mr. Peterson a warranty deed —who gave their evidence in a way to command the belief of the court. Besides, Peterson does not deny that he saw the pump and heard that it was supplied with water from a well, but does deny that he was told that the other dwelling was similarly supplied. But he knew that both dwellings were a part of one building, and that in external appearance they were precisely alike; that the other dwelling was occupied; he fixed the value of the choice between the two houses at only $10, which was due, as he admits, to a difference in the size of the front yard, which would necessarily result, as shown by the plot, from a division of it in the way proposed and agreed upon. He does not contend that his choice was due to any supposed difference in the interior of the houses, or to the presence of water in one and its absence in the other, or that he supposed that each house had an independent supply of water. These circumstances render it highly improbable that he did not, in some way, learn that both dwellings were supplied with water in the same way and from the same source. It was, to say the least, not probable that the proprietor of such a lot and building would incur the expense of an independent water-supply to each dwelling.

Upon this case, the complainant, in his able brief, makes two points which support each other, and either of which, standing alone, he contends, entitles him to relief. *First.* That the well and aqueduct running therefrom to complainant's house constitute

a change of a permanent nature in the structure of defendant's tenement, made for the benefit of complainant's tenement by the owner of both, of which defendant had actual notice through her agent before she purchased, and which was of such a nature as to be discovered on an examination, and hence became an apparent and continuous easement in favor of complainant's tenement upon the defendant's tenement. *Second.* That the effect of the transaction between complainant, defendant and Mrs. Mabey, was a purchase by the two jointly from Mrs. Mabey, with an agreement between the two that the property should be divided in the manner stated, and that the arrangement for the supply of water for each house should remain as it was.

It seems to me that the controlling question is, whether the arrangement for the supply of water to complainant's house constituted what is known to jurists as a " continuous and apparent " easement, which was " necessary " in the sense in which that word is used in that connection, for the comfortable use and occupation of the complainant's premises.

As to the quality of its being " apparent," the fact that it was, in part, hidden in the earth, and so not physically apparent to the eye, is not conclusive. The part on complainant's land—the pump—was visible, and the water must have come either from the land actually conveyed to him or from that conveyed to Peterson. Independent of the actual notice, I am of opinion that Mrs. Peterson, under the peculiar circumstances of this case, is chargeable with notice that there was such a pump on the complainant's tenement, and that it might connect with the well or cistern on the part that was conveyed to her.

It seems to be well settled that the mere fact that a drain or aqueduct, as the case may be, is concealed from casual vision, does not prevent it from being " *apparent* " in the sense in which that word is used in that connection. The aqueduct, in *Nicholas* v. *Chamberlain, 2 Cro. 121;* the drain, in *Pyer* v. *Carter, 1 Hurlst. & N. 916;* the aqueduct, in *Watts* v. *Kelson, L. R. 6 Ch. 166;* in *Brakeley* v. *Sharp, 1 Stock. 9* and *2 Stock. 207;* in *Seymour* v. *Lewis, 2 Beas. 439,* and in *Toothe* v. *Bryce, 5 Dick. Ch. Rep. 589,* were all buried beneath the surface and not visible

to the casual observer, and yet the easement in each case was. upheld. The point of actual appearance to the eye was distinctly raised in *Pyer* v. *Carter*, and overruled. There, as here,. the two dwellings were under one roof, and once had a common owner, and had a drain in common for the use of both, which was not visible. Baron Watson, in his considered judgment,. used this language: " We think it was the defendant's own fault that he did not ascertain what easements [the drain] the owner of the adjoining house exercised at the time of the purchase." Although this case has been severely criticised as to the main ground upon which it was decided, the part of it just quoted has not been questioned, and the general result was undoubtedly right. See *Toothe* v. *Bryce, 5 Dick. Ch. Rep. 599.*

It is true that, in each of the cases of aqueducts above cited, both ends of the pipe—as well that from which the flow of water came as that to which it was carried—were probably visible, while here only that end was visible which was on the dominant tenement; but I am of the opinion that where, as here, and in *Toothe* v. *Bryce,* the dominant tenement is conveyed and the servient tenement is reserved, the controlling fact is that the existence of the *quasi*-easement is shown by something in sight upon the dominant tenement. That is the point to which the attention of the purchaser is naturally directed; and the principle upon which the cases go is that he is entitled to the tenement he buys in its then present condition, and the use of all such easements as are apparent and continuous. Now, the easement which he sees on the tenement which he buys must be held to be apparent.

It seems to me that, in *Toothe* v. *Bryce,* the result must have been the same if the ram which drove up the water to the tenement conveyed to the complainant, had been entirely invisible.

In the case in hand the controlling fact is that the pump was there visible and in use, and by its connection with the invisible pipe leading to *some* fountain the house conveyed to complainant was supplied with water.

This view must hold if the defendant's tenement had been retained by Mrs. Mabey and the action were against her instead

of Mrs. Peterson ; and, according to the well-settled rule in this court, the result would be the same if Mrs. Mabey had conveyed to Mrs. Peterson and retained the lot conveyed to complainant, provided Mrs. Peterson had notice of the actual fact that the pump on the lot retained was supplied by water from a well which might prove to be on the lot conveyed (see the cases on this point in *Toothe* v. *Bryce*) ; and provided, of course, the easement had the other elements requisite, viz., that of being continuous and necessary in the qualified sense in which that word is used in that connection. In short, in my opinion all that is meant by "apparent," in that connection, is that the parties should have either actual knowledge of the *quasi*-easement or knowledge of such facts as to put them upon inquiry.

Next, as to the quality of being "continuous." Mr. Gale, in the later editions of his book—§§ *50, 52* (*4th Eng. ed., 1868, pp. 87, 89*)—comes to the conclusion that the test of continuousness is that there should be an alteration in the quality—or "disposition"—of the tenement, which is intended to be, and is, in its nature, permanent, and gives the tenement peculiar qualities, and results in making one part dependent, in a measure, upon the other. It is not of the essence of this test, as applied to a watercourse, that the water should flow of itself continuously, but the test is that the artificial apparatus by which its flow is produced is of a permanent nature. It is with a view of bringing out this quality of permanence that the learned author contrasts this class of easements with a right of way, " the enjoyment of which depends upon an actual interference of man at each time of enjoyment." Now, what is meant by that sentence is that the burthen of the easement in the case of a right of way is not felt by the servient tenement except at the moment of each enjoyment of it. A permanent structure upon, or alteration of, the servient tenement is not a necessary element of such an easement. And by the expression "interference of man at each time of enjoyment" is meant no more than an interference with the servient tenement by an entry upon it, as illustrated not only by ordinary rights of way, but also by rights of way

with a right to take something from the servient tenement, as in *Polden* v. *Bastard, 4 Best & S. 257; L. R. 1 Q. B. 156.*

I stop here to say that the distinction between a watercourse and a formed and metaled road constructed for permanent use is quite thin, and there have been expressions of judges in modern times intimating an inclination to hold that where a dwelling or other such tenement is conveyed with an artificially-formed road leading to it over other lands of the grantor which are reserved, a right of way ought to be held to pass.

The true distinction between a continuous and a non-continuous easement is again illustrated by the case of the rain-water drain in *Pyer* v. *Carter,* through which the water actually ran only when it rained, and yet it was held continuous because it was permanent and constituted a permanent alteration in the structure of the tenement.    Suppose that in that case it had been necessary for the plaintiff on each occasion of a rain to pump the rain-water from a pit in his cellar into the drain, would it have been, by reason of that arrangement, any the less continuous?    I think not.    In short, I conclude that the word "continuous" in this connection means no more than this—that the structure which produces the change in the tenement shall be of a permanent character, and ready for use at the pleasure of the owner of the dominant tenement without making an entry on the servient tenement.    In *Seymour* v. *Lewis, supra,* although the water did run by gravity, the head was so small that a sufficient supply could not be procured without the use of a pump, and a pump was in actual use; and yet that did not destroy the continuous character of the easement.

For these reasons I conclude that the easement here in question is both apparent and continuous.    That it was "necessary" in the sense in which that word is used in this connection is undeniable.

In this case there is no room for the application of the distinction, even if that distinction were recognized by this court, between the *reservation* and the *grant* of an easement of this character upon the severance of the tenement.    The conveyances from the original proprietor, which produced the severance, were

simultaneous, and amounted, under the circumstances, to a voluntary partition between complainant and defendant. In such a case, as shown by Chancellor Williamson, in *Brakeley* v. *Sharp, 2 Stock. 207*, the rule that a man cannot derogate from his own grant does not apply.

I conclude that the complainant is entitled to the relief prayed for, and will so advise.