[No. 4978.]
[No. 2146 C. A.]

## THE CITY OF DENVER v. THE DENVER UNION WATER COMPANY.

1.  Appellate Practice — Practice in Civil Actions — Pleading —
    Motions—Discretion.

Rulings on motions directed to the pleadings are largely within the discretion of the trial court, and will not be interfered with on writ of error, unless it clearly appears from the record that such discretion has been abused.—P. 88.

2.  Appellate Practice—Assignments of Error—Matters Included
    in Briefs.

Where rulings of the trial court on motions to pleadings are relied on for reversal, the precise language to which the motions are addressed· should be called to the attention of the appellate court by quoting the same in the briefs.—P. 89.

3.  Appellate Practice—Findings of Fact Not Based on Conflicting Evidence—Not Disturbed on Error.

Where findings of fact and a decree are based on either conflicting or undisputed evidence, and there is substantial evidence to support them, they will not be disturbed on writ of error. —P. 93.

4.  Cities and Towns—Water Supply—Rates—Decree.

The franchises of a water company to which defendant succeeded provided that, after five years, the city council might require the company to fix schedule rates for private consumers equivalent to an average rate for the same service prevailing in three certain cities. In a suit to establish such rate, it was found impossible to determine the average rate for the same service prevailing in such cities, because the charges in each of said cities were fixed on an entirely different basis. Held, that a decree attempting to fix a schedule according to such average, in which more than two-thirds of the rates established were not based on the rates charged in such cities, but were the same as the rates charged by the water company prior to the institution of the action, was erroneous.—P. 94.

5.  Same—Issues.

An action was brought against a water company to establish a new schedule of rates in accordance with a franchise authorizing the city council to require the company to fix schedule rates for private consumers equivalent to the average rate prevailing in three other cities for the same service, and the complaint

charged that the schedule fixed by the company was not the average rate for the same service prevailing in such cities, and issue was joined thereon. Held, that a schedule of rates, not based on the average rate charged in the cities in question, but decreed as a "fair, just, and reasonable rate," was erroneous, as not being within the issues.—P. 97.

6. **Same—Franchise Provisions—Enforcement.**

A provision in a water company's franchise authorized the city to require the company to fix schedule rates for private consumers equivalent to the average charge for the same service prevailing in three other cities. Held that, where the water rates of such other cities are based on such radically different classifications and methods of computation, and such a diversity of uses and services, that it is practically impossible to ascertain an average schedule of such rates, such ordinance is invalid.—P. 101.

7. **Same—Contract for Service—Outlying Districts Incorporated in City.**

Where a water company's franchise fixed the rates for service, and an ordinance conferred on the company the privilege of laying mains in streets, avenues, alleys, and public places of the city "and additions thereto," independent contracts to furnish water to consumers in districts outside the city at different rates are neither abrogated nor affected by the subsequent incorporation of such districts within the city limits.—P. 106.

8. **Same—Pressure.**

A water company's franchise required a pressure of 115 pounds at a specified hydrant. With the city's consent, the system was changed from a pumping to a gravity system, which resulted in largely increasing the water supply, in case of fire or conflagration, but reduced the pressure at the ruling hydrant to 85 pounds. The evidence showed that the later system furnished an abundant and much greater water supply, which would be equivalent to an amount of water obtained at a pressure of 115 pounds at the ruling hydrant in cases of fire, and that the city's officers had declined to permit a return to the pumping system. Held, that the company, under the conditions, had not violated its franchise by permitting the pressure to decrease at the ruling hydrant.—P. 112.

*Error to the District Court of Arapahoe County.*

*Hon. Owen E. Le Fevre, Judge.*

Action by the city of Denver against The Denver

Union Water Company.   From a judgment in favor of defêndant, plaintiff brings error.

*Affirmed in part, and reversed in part.*

Decision *en banc.*   Mr. JUSTICE CAMPBELL not participating, and CHIEF JUSTICE STEELE concurring with exception that he believes section 5 of the ordinance of 1890 to be enforcible.

Mr. JAMES M. ELLIS, city attorney, Mr. H. M. ORAHOOD, city attorney, Mr. HENRY A. LINDSLEY, city attorney (Mr. WM. HENRY SMITH, special counsel), for plaintiff in error.

Mr. CHARLES J. HUGHES, Jr., for defendant in error.

Mr. THOMAS B. STUART, *amicus curiae.*

Mr. JUSTICE MAXWELL delivered the opinion of the court:

April 10, 1890, the city council of the city of Denver passed an ordinance, known as "Ordinance No. 44, Series of 1890," the title of which is: "A bill for an ordinance continuing and extending the franchise and privileges of The Denver Water Company and making a contract with such company for the supply of water for public and private purposes." It is not necessary to set out this ordinance at length in this opinion. It is sufficient to say that in its general provisions it is similar to ordinances of like character granting to the company, its successors and assigns, the right to lay and maintain its pipes in the streets, avenues, alleys, and public places of the city for the purpose of supplying the city and its inhabitants with water for municipal and domestic uses for the term of 20 years from its date. The sections of the ordinance pertinent to the matters involved in this controversy are as follows:

"Sec. 5. The rate to private consumers for water shall not be greater than now charged by the said The Denver Water Company, a schedule of which rates is hereto annexed, marked 'Schedule A,' and the said The Denver Water Company may require any consumer to furnish a meter and pay for water by meter measurement; provided, however, that at any time after five years from date the city council may require said company to fix schedule rates for private consumers equivalent to the average rate prevailing in the cities of Chicago, St. Louis and Cincinnati, for the same service.

"Sec. 6. The said The Denver Water Company shall at all times furnish water to the city and to private consumers of a quality as good and fit for private consumption as that shown by the analysis made by order of the city of Denver by Prof. Joseph A. Sewall, in the month of August, 1889.

"Sec. 8. The said company shall at all times until the 1st day of May, 1891, keep and supply the said hydrants with an abundant supply of water for fire purposes under such pressure as it now gives; and after said 1st day of May, 1891, shall supply all of said hydrants and any hydrant which may be ordered to be set upon additional mains, as hereinafter in this ordinance mentioned, with a pressure equivalent, taking the elevation of the surface of the ground into account, to one hundred and fifteen pounds at the hydrant in front of the Union Depot in said city; provided, the city shall not be in default with the company upon any of its agreements, and provided, further, that, if, owing to the extension and growth of the city, hydrants shall be ordered upon locations where, owing to the difference in elevation, there shall be less than forty-five pounds pressure, with a pressure of one hundred and fifteen pounds at the hydrant in front of the Union Depot, to the

number of fifty or more, the said company shall put such hydrants upon a separate high service, and keep and maintain on each of said hydrants a water pressure of not less than fifty pounds."

Attached to this ordinance is a schedule of water rates, designated as "Schedule A." This ordinance was accepted by the company in writing, and thereby became a contract between the city of Denver and the water company, its successors and assigns.

The Denver Union Water Company, defendant in error here, became the owner of the property and franchises of The Denver Water Company some time during the year 1894, and is the successor of The Denver Water Company under the terms of the ordinance, charged with all of the duties and liabilities imposed by the ordinance, and entitled to all the rights and benefits thereby granted.

October 2, 1895, the city council of the city of Denver passed a resolution requiring The Denver Union Water Company to fix a schedule of rates for private consumers of water in the city of Denver equivalent to the average rate prevailing in the cities of Chicago, St. Louis and Cincinnati for the same service, in accordance with the provisions of section 5 of the ordinance hereinbefore quoted.

Intervening the last above date and November 1, 1895, the date upon which the semiannual water rates for the ensuing six months became due, the water company issued a schedule of rates which was entitled: "The Denver Union Water Company's Schedule of Semiannual Rates, Payable in Advance on the First Days of May and November for Each Year at the Office of the Company, 501 17th Street, Corner of Glenarm Street. To Take Effect November 1, 1895." This schedule of rates will be hereafter referred to as the "leaflet schedule."

April 29, 1897, the city council of the city of Denver passed an ordinance in which it was declared that the rates charged by The Denver Union Water Company to private consumers of water are not, and had not been since October 2, 1895, nor since April 10, 1895, equivalent to the average rates prevailing in the cities of Chicago, St. Louis and Cincinnati to private consumers of water for the same service, and required the company, on or before 10 days after the date of the passage of the ordinance and the service of a copy thereof upon the company, to comply with the terms of the resolution of the city council passed October 2, 1895. A certified copy of this ordinance was served upon the company shortly after the passage thereof and before the commencement of this suit.

May 21, 1897, a complaint was filed in the district court of Arapahoe county by the city of Denver as plaintiff against The Denver Union Water Company as defendant. This complaint in effect alleged that the water company had failed and refused to comply with the requirements of section 5 of the ordinance above quoted, relating to the fixing of a schedule of rates as therein specified. It further alleged that the defendant had violated section 6 of the ordinance, in that the water which it had furnished was impure and unwholesome for domestic uses, and also that there had been a failure upon the part of defendant to supply the pressure required by the provisions of section 8 of the ordinance. The prayer of this complaint was for an order of the court directing the defendant to establish a schedule of rates equivalent to the average rate prevailing in the cities of Chicago, St. Louis and Cincinnati for the same service, and that such schedule of rates, when so prepared by the defendant, should be submitted to the court and by its decree made the

schedule of rates for private consumers of the city; that the court should fix a schedule of rates for private consumers equivalent to the average rate prevailing in the cities of Chicago, St. Louis and Cincinnati for the same service; that the defendant by order of the court be required to furnish the quality of water and the pressure required by the ordinance; for a preliminary injunction restraining the defendant from collecting any water rates from private consumers of water until the rates had been fixed and determined by the court pursuant to section 5 of the ordinance of 1890; for an order compelling the defendant to allow a rebate on all rates by it collected since April 10, 1895, in excess of the rates allowed by section 5 of the ordinance of 1890; and for general relief.

This statement of the relief prayed by the plaintiff is here made upon the theory that the prayer of the complaint or bill in equity, in general, indicates the nature of the bill and the character of the relief sought by the pleader, and for the purpose of indicating at the outset of this discussion the objects which were sought to be attained by the plaintiff by and through this proceeding.

After the service of summons, but before the appearance of the defendant, an amended complaint was filed by the plaintiff June 19, 1897. The substance of this amended complaint was in effect the same as the original complaint, with much elaboration, however. The amended complaint embodied in detail Schedule A, which was the schedule of water rates attached to the original ordinance of 1890, and referred to in section 5 of said ordinance, and in a parallel column set forth a schedule of water rates which was alleged to be the equivalent of the average rate prevailing in the three cities named in the ordinance for about three-fourths of the items contained

in Schedule A, or such items as it at that time seemed possible for plaintiff to give the average of. The allegations of this amended complaint as to the failure of defendant to comply with the requirements of sections 6 and 8 of the ordinance were much elaborated, but in effect the same as those of the complaint. The prayer of this amended complaint was substantially that of the original complaint.

A motion to strike certain allegations of the amended complaint and a motion to make the same more specific were interposed by defendant to the amended complaint. In the main these motions were ruled by the court in favor of the defendant. The rulings of the court upon these motions adverse to the plaintiff have been assigned as errors, and will be hereafter considered and disposed of.

As a result of the ruling of the court upon the motion to make more specific, plaintiff filed a second amended complaint October 15, 1897, which in substance was the same as the original and amended complaints, differing, however, from those pleadings, *inter alia,* in this: that pursuant to the order of the court there was embodied in this complaint a table of rates in parallel columns, alleged by plaintiff to contain the schedules of rates prevailing in the cities of Chicago, St. Louis and Cincinnati for private consumers for the same service or character of service, provided for by Schedule A, an average of the three cities named, "Schedule A," and the schedule of rates promulgated by the company previous to November 1, 1895, known as the "leaflet rates." This table of rates, comprising the six schedules above enumerated, was denominated a "comparative table." It is noticeable that the average rate of the three cities as given in this comparative table differs very materially from the average rate of the three cities set forth in the complaint and the amended

complaint. The prayer of this second amended complaint was substantially the same as that contained in the complaint and amended complaint.

Upon motion of defendant, and pursuant to an order of court, plaintiff was required to plead in their entirety the ordinance of the cities of Chicago, St. Louis and Cincinnati which established water rates for private consumers in those three cities. This was done by filing an amendment to the second amended complaint.

At this stage of the proceedings counsel for the defendant took the position that the second amended complaint stated three causes of action, based upon alleged violations of the contract by the defendant, relating to its failure to establish a schedule of rates as required by section 5, its failure to provide the quality of water required by section 6, and its failure to supply the city with the pressure required by section 8. This view of the controversy seems to have been concurred in by the court below.

The order of the court upon this motion of defendant is not set forth in the abstract of the record, but the result contended for by defendant seems to have been accomplished by an order October 18, 1897, requiring defendant to answer, on or before October 24, 1897, that portion of the second amended complaint which applies to the schedule of water rates, with leave to plead as it shall be advised within ten days from date as to the other parts of the second amended complaint. From the date of this order the trial proceeded upon the theory that there were three causes of action stated in the complaint, involving, respectively, the causes of action above set forth, to wit, price, purity, and pressure.

The defendant filed its answer October 23, 1897, to the second amended complaint relating to water rates, by which answer the material allegations of

the second amended complaint as to water rates were put in issue, except such allegations as might be denominated formal.

In passing, it might be well to state that the allegations of the second amended complaint relating to the failure of defendant to comply with the requirements of section 5 of the ordinance were to the effect that the defendant had wantonly failed to fix a schedule or rates for private consumers equivalent to the average rate prevailing in the cities of Chicago, St. Louis and Cincinnati, as required by the terms of section 5 of the ordinance and the action of the city council of the city of Denver, and that the defendant had broken its obligations, duties, and promises assumed by it under said section of the ordinance.

In response to the allegations of the second amended complaint that the defendant had failed and refused to comply with the requirements of section 5, while the answer denied that it had failed or refused to comply with the requirements of said section, nowhere does it affirmatively appear in the answer by any allegation that it had complied with the requirements of said section. On the contrary, it affirmatively appears from the answer that the defendant had not complied with such requirements, as a careful reading of the answer will disclose, and as is shown by the last paragraph of defendant's answer, which is as follows: "Defendant alleges, upon information and belief, that it is now collecting and receiving less, and that the schedule of November 1, 1895, fixes and provides for lower rates and charges than the said defendant is entitled to fix and collect under the terms and provisions of section 5 of the contract of April 10, 1890, and that it will be found, upon an inspection of the schedule of rates alleged by the plaintiff to prevail in the said cities

of Chicago, Cincinnati and St. Louis, that an exact
average of item by item therein contained, or of the
items contained in Schedule A, attached to the con-
tract of April 10, 1890, or of the rates contained in
the semiannual schedule of rates of November 1,
1895, cannot be determined or ascertained, but that
the said defendant is charging and collecting, and in
its said November 1st schedule of rates provided for
the collection of, rates less than the equivalent of
the average of the rates prevailing in said three cities
for the same service, and that it has been moved
and induced to make such rates, reduced far below
that which it could be required to make or charge,
because it has desired to escape criticism and attack
of a public and political nature, and that it might
be left to conduct it business, to the end of discharg-
ing all its obligations to the public and its consumers,
without being embarrassed and harassed by false
and unjust costs, charges, and denunciations, and
that it believes and alleges that this honorable court
will ascertain and determine that it has done more
in the way of reducing rates for private consumers
in the city of Denver than it can or should be re-
quired to do, in view of the character and nature of
the service rendered by it to said private consumers,
and the nature and character of the service rendered
in each of the said cities of Chicago, Cincinnati and
St. Louis to the private consumers therein.    And
defendant further alleges that the rates charged and
demanded by it are reasonable rates to be charged
and demanded for the services rendered by it in
supplying water to private consumers.''

October 27, 1897, plaintiff filed its replication
to the answer of defendant, which was a general
denial of the new matter contained in the answer.

In the foregoing statement no attempt has been
made to embody in this opinion anything more than

the briefest possible statement of the issue presented
by the pleadings upon the alleged failure of defend-
ant to comply with the requirements of section 5 of
the ordinance. Up to this point the pleadings, mo-
tions, demurrers, etc., with the court's ruling there-
on, occupy 179 pages of the printed abstract. If
the issue presented by the pleadings has been clearly
stated, no necessity exists for embodying an abstract
of the pleadings herein, and no beneficial result would
be gained.

As to the errors assigned by plaintiff upon the
rulings of the court upon the motions of defendant
to make more specific, definite, and certain the alle-
gations of the amended complaint, and the motion to
strike therefrom certain portions thereof for the
reason that they were immaterial and irrelevant, it
is sufficient to say that, under the well-settled rule
of this jurisdiction, rulings of the court upon such
motions are very largely within the judicial discre-
tion of the trial court, and that, unless it clearly ap-
pears from the record that the court below abused
such judicial discretion, this court will not interfere
with the same. From a careful consideration of the
record in this case, this court is unable to say that
there was any such abuse by the court below of the
judicial discretion vested in it in its rulings upon
these various motions as resulted in prejudicial error
to the plaintiff.

In this connection it might be well to state that
it has been a laborious task to connect the motions as
they appear in the printed abstract of the record
with the pleadings to which such motions are ad-
dressed, for the reason that the motions as they
appear in the record are in the usual form of such
motions, referring to the pleadings by page and line
as they were filed in the court below, whereas, in the
printed abstract furnished this court, the paging is

entirely different. We would suggest that, where
counsel seriously rely upon the errors alleged to
have been committed by the court in such rulings,
they call the attention of this court to the precise
language to which the motions are addressed, by
quoting the same in their briefs, thereby relieving
the court of much unnecessary labor. These remarks
are especially pertinent to the record proper in this
case, which occupies 228 pages of the printed ab-
stract.

We have examined the argument of counsel for
plaintiff with a great deal of care, and are of the
opinion that he has failed to call the court's attention
to any ruling made by the court below which in any
wise appears to us to be an unwarranted exercise of
the court's authority in matters of this nature. On
the contrary, we believe that the orders of the court
were warranted, and tended to simplify the issues,
expedite the trial, and did not deprive the plaintiff of
any of its rights. After the issues had been framed
as hereinbefore stated, the hearing of testimony pro-
ceeded before the court without a jury through
several months, and on the 9th day of February,
1898, the court rendered its opinion and made its
findings upon what we shall designate the first cause
of action. The opinion and findings of the court
occupy forty-four pages of the printed supplemental
abstract of defendant. It will be unnecessary to set
forth the opinion of the court in this opinion. Such
portions, however, as serve to indicate the process
of reasoning, based upon the evidence in the case,
adopted by the court below in arriving at its con-
clusions, will be from time to time quoted herein as
this opinion proceeds.

The court in its opinion promulgated a schedule
of rates to be adopted by the defendant for water
furnished by it to the private consumers of the city

of Denver. This schedule, so far as the items therein are concerned, was based upon "Schedule A," which was a part of the ordinance of 1890. We find from the record that the items of service included within "Schedule A," exclusive of irrigation rates and meter rates, were 107, that the leaflet schedule of rates contained 142 items, and that the schedule of rates promulgated by the court contained 135 items. This increase of items in the court schedule over the items contained in "Schedule A" seems to have been warranted in the opinion of the court by the fact, which appeared in evidence, that other and different uses of water in the city of Denver had grown up since the adoption of the ordinance of 1890.

The above statement is made for the purpose of showing the number of items of service concerning which testimony was introduced at the trial, and upon which, under the issues framed, the court was required to fix and establish a schedule of rates. It also indicates to some extent the voluminous character of the evidence introduced at the trial.

The findings of the court were as follows: "(1) That the schedule of annual water rates established this 9th day of February, A. D. 1898, shall be payable semiannually in advance on the 1st day of May and November, respectively, A. D. 1898, and on the same days of each year thereafter. (2) That this schedule of rates for private consumers of water in Denver has been obtained by adding together the prevailing minimum rates in Chicago, St. Louis and Cincinnati, and dividing the sum thus obtained by three, the number of cities contributing; but whenever either of the said three cities have no prevailing rates, and thereby fail to contribute a price or rate, then we have allowed as the rate to be hereafter charged whatever the rate was for such service in Denver on

the 1st day of November, A. D. 1895.   (3) That the prevailing rates referred to in Ordinance No. 44 of the series of 1890, in section 5, and which have been taken in determining the rate to be charged in Denver, mean and are held to be the present existing minimum rates charged in Chicago, St. Louis and Cincinnati for any specific service.   (4) Minimum rate means the lowest price given or calculated in each of the three cities for a specified thing, being, in Chicago, a frontage of twelve feet; in St. Louis, the least desirable location for any kind of business; and, in Cincinnati, the lowest charge for area space, 500 square feet or less, accompanied by the minimum use of water.   (5) That the question of discount is a matter of private regulation, a rule of the water departments in Chicago and Cincinnati, and is not found in St. Louis.   Nowhere is a discount a part of the price, as appears from and is set forth in the water rates of either of these cities.   (6) That the rules and regulations of the defendant company, of which complaint has been entered, are not harsh, oppressive, nor unreasonable to that degree or extent as would warrant a court in entering an order decreeing that such rules and regulations be changed, modified, or annulled.   We find the same rules, of like severity, in each of the three cities, and abundant legal authorities in different states upholding their enforcement.   (7) That the prevailing rates at this date in Chicago, St. Louis and Cincinnati are not the rates which prevailed in these cities in October, 1895, when a demand was made by the city council, nor on November 1, 1895, when the defendant company fixed its schedule of rates as set forth in its leaflet.   (8) That the evidence fails to show that the defendant wholly, or at all, wantonly or otherwise, failed, in October, A. D. 1895, to make a schedule of rates which was not the equivalent of

the average prevailing rate then in force in the three cities. (9) That the defendant company will be entitled to collect from all private consumers of water such amounts as were due and payable on the 1st days of May and November, A. D. 1897, in accordance and compliance with the rates as set forth and fixed by the defendant company on the 1st day of November, A. D. 1895. (10) That the rates provided to be fixed in and by section 5 of the contract of April 10, 1890, are not by the terms of the said contract, and cannot be, by plaintiff, made to apply to towns which have been, since the making of said contract of April 10, 1890, annexed to the city of Denver by a vote of the inhabitants thereof, and that the respective rights of the defendant company, and of the inhabitants of the territory embraced in said independent towns which have been annexed, remain as though there had been no annexation thereof, and are to be controlled only by the contracts existing between the said defendant company and said independent towns or cities, and that the plaintiff has only the rights in the premises as against the said defendant that were had or might be asserted by the said independent towns and municipalities against the defendant company, had there been no annexation, and that the rights and obligations, respectively, of the plaintiff and defendant, are the same as the rights and obligations of the said defendant and the said towns and municipalities were prior to the said annexation, and that this finding applies, respectively, to the inhabitants or territory embraced within the former towns and cities of Highlands, Colfax, Barnum, South Denver, and Harman, being the only towns and cities concerning which, and the annexation of which to the city of Denver, any evidence has been introduced in this cause, and that the same rule is applicable to all

other towns that may hereafter be annexed to said city in the same manner as the towns herein enumerated. (11) That the same service designated as irrigation of lots in 'Schedule A,' which is attached to and made a part of the contract of April 10, 1890, does not exist in either of the cities of Chicago, St. Louis or Cincinnati. (12) That the defendant is entitled to collect and receive rates for and on account of any uses not enumerated and set forth in the schedule in this decree fixed and established at a rate not higher than is fixed and determined in and by the schedule herein fixed and established for the same service; that is to say, for the same quantity and use of water under like conditions and circumstances: provided that such uses be not the same which are now covered by and included in the items and rates charged and collected for under the items contained in said schedule of rates herein fixed and determined.''

The position of defendant in this court is that the findings and decree of the trial court upon the issues of fact are conclusive, because they were findings and a decree upon questions of fact either upon conflicting evidence or upon undisputed evidence sustaining and tending to sustain the findings of the court.

The rule in this state is well settled that where the findings of fact and decree are based upon either conflicting or undisputed evidence, and there is substantial evidence to support them, taken before the court below, which sustains or tends to sustain such findings and decree, this court is precluded by such findings and decree, and will not disturb the same. Citation of authorities is not necessary in support of the above rule, as the Reports of this state are full of such authorities.

In view of the above rule, it is important to

always keep in mind the issue presented by the plead-
ings upon the question now under consideration.
Without question the original complaint, the amended
complaint, and the second amended complaint in-
tended to present to the court a claim upon the part
of the city of Denver that the defendant had failed
to comply with section 5 of the ordinance, relating
to the fixing of a schedule of rates for private con-
sumers which should be equivalent to the average
rate prevailing in the three cities mentioned for the
same service. This is manifest from the fact that
the resolution adopted by the city council October 2,
1895, and the ordinance adopted April 29, 1897,
which are alleged to be authority for the commence-
ment and prosecution of this action, make no mention
of the failure upon the part of the company to com-
ply with section 6 or section 8 of said ordinance,
relating to the purity and pressure of the water fur-
nished by the defendant. This being the case, our
inquiry is limited to the one question, namely: Is
there competent evidence in the record sustaining or
tending to sustain the schedule of rates promulgated
by the court below, as being a schedule for private
consumers which is the equivalent of the average
rate prevailing in the three cities mentioned for the
same service?

After an exhaustive examination of the evidence
in this case we are forced to the conclusion that the
evidence does not sustain or tend to sustain the
schedule of rates promulgated by the court, for rea-
sons which will now be stated. The defendant at the
trial introduced no testimony as to the schedules of
rates prevailing in the three cities mentioned, relying
upon its cross-examination of the witnesses intro-
duced by the plaintiff. The plaintiff introduced
certified copies of the schedule of water rates exist-
ing in the three cities at the date of the trial, the testi-

mony of an accountant whose experience in that line of work consisted of three or four months' labor, previous to testifying in this case, in an effort to arrive at an average of the rates charged in the three cities mentioned to their private consumers for the same service rendered by the defendant to its private consumers.  Plaintiff also introduced one witness from each of the three cities mentioned, who were in some capacity connected with the water departments of those cities, who testified in support of the testimony which had been adduced from the plaintiff's accountant, and also as to the manner and method of arriving at the rates charged to private consumers by the water departments of the several cities.  At the very outset of the investigation it was developed that there existed in each of the three cities mentioned a system of determining rates charged private consumers, based upon the schedule of rates found in the ordinances, which differed from the system prevailing in the other cities, and also differed from the system prevailing in the city of Denver.  To illustrate: The testimony shows that in the city of Chicago the system prevails of charging what is known as a "frontage rate" against every building which fronts upon a street through which, or along which, a water main has been laid. This "frontage rate" is in addition to the charges made for instruments of service which may be used in the building.  It is based upon the minimum of twelve feet front of a one-story building, and increases as the frontage increases and the number of stories in the building increases.  In St. Louis the rate for water is determined by the location of the water consumers; the least desirable location being charged the lowest rate, and the most desirable location being charged the highest rate.  In Cincinnati the charge is regulated by the space occupied by the

consumer, upon a basis of 500 square feet for the minimum charge.

From the above statement it will be readily seen that owing to the radically different manner in which charges are made under the ordinances and schedules of the three cities, it is absolutely impossible to arrive at an average rate for the three cities, for the reason that it is absolutely impossible to average frontage, locality, and space.

As the taking of testimony progressed, it developed that in one or more of the three cities there was no charge whatever for a large number of items of service included in "Schedule A." The court in finding 2 said: "That this schedule of rates for private consumers of water in Denver has been obtained by adding together the prevailing minimum rates in Chicago, St. Louis and Cincinnati, and dividing the sum thus obtained by three, the number of cities contributing; but whenever either of the said three cities have no prevailing rates, and thereby fail to contribute a price or rate, then we have allowed as the rate to be hereafter charged whatever the rate was for such service in Denver on the 1st day of November, A. D. 1895."

If the court, in arriving at the schedule of rates which it promulgated, had strictly adhered to the rule announced in the above finding, no rate could have been arrived at for more than two-thirds of the items in the schedule adopted by the court, for the reason that in one or more of the schedules of the three cities mentioned no rate was fixed for more than two-thirds of the items of service covered by the schedule promulgated by the court.

It is possible that, if the testimony had disclosed that no rate was fixed in one or more of the cities for a few only of the items included within the court's schedule, the rule adopted by the court above stated

might have been unobjectionable upon the theory that a substantial compliance with the terms of a contract is all which the law requires.

If the court had adhered to the rule announced, it would have resulted in leaving the schedule of rates adopted by the company in 1895 in full force and effect as to more than two-thirds of the rates fixed by such schedule, and in our opinion must have resulted in the court arriving at the conclusion that it was absolutely impossible to determine the average rate prevailing in the three cities mentioned for the same service, and therefore impossible to enforce the provisions of the contract existing between the city and the company, in so far as the requirements of section 5 of the ordinance are concerned.

To escape this conclusion, however, over the objection of defendant, testimony was introduced which was an attempt to establish a rate in one or more of the three cities mentioned where no such rate prevailed. In other words, the court allowed testimony to be introduced, over the objection of defendant, for the purpose of establishing rates for items of service in the three cities where no rate prevailed, and therefrom computed an average, which average appears in the schedule promulgated by the court in more than two-thirds of the items therein contained. If, under the testimony, it had been possible to thus supply the missing rates in one or more of the three cities with definiteness and certainty, such method of computation might not have been objectionable; but the witnesses who testified upon this point, from the necessities of the case, were compelled to assume the existence of certain facts in many instances which were not supported by the evidence.

When this method of computation was called in question by the defendant, by objections to the testimony and upon cross-examination, the witnesses

testified that the above assumptions were made because they were fair, just, and reasonable, thereby introducing into the case questions which were not in any manner presented by the issue. The court was not called upon, by any issue presented by the pleadings, to determine a fair, just, or reasonable rate for the private consumers of the city of Denver. It was its duty, and its duty only, under the issue presented, to determine, if possible, the average rate prevailing for the same service in the three cities mentioned. Anything beyond this was outside of and beyond any issue in the case. The admission of such testimony was without justification upon any principle with which we are familiar. Without such testimony it would have been, and was, absolutely impossible for the court to arrive at a schedule of rates for the private consumers of the city of Denver required by section 5 of the ordinance.

This sort of testimony pervades the record, and, as above stated, more than two-thirds of the rates established by the court in the schedule promulgated by it are based upon such testimony, and such testimony only. The cross-examination of plaintiff's witnesses by defendant's counsel emphasized in a marked degree the incompetency of the evidence upon which the decree of the court was largely based.

That this method of computation and calculation was adopted by the court is manifest from finding 4: "Minimum rate means the lowest price given or calculated in each of the three cities for specified things," etc. In the schedule of rates promulgated by the court the minimum and the maximum rate is established for 36 items. In every instance the maximum rate thus established is identically the same as that set forth in the schedule adopted by the company in October, 1895, and known as the "leaflet schedule."

The testimony in the case has been examined with the utmost care, and we fail to find any testimony whatever in support of any maximum rate promulgated by the court in its schedule.

That the court adopted the maximum rate of the leaflet schedule, without any evidence to justify such action, is conclusively shown by the following extract from the court's opinion: ''The following table will therefore be held to be the schedule of minimum and maximum rates fixed for private consumers of water in the city of Denver, which rates we find to be equivalent to the average minimum rate prevailing in the cities of Chicago, St. Louis and Cincinnati for the same service. The maximum rate, where a maximum is given, is based upon that found in Schedule A, with the reduction therefor found in the leaflet.''

In our view, the maximum rate which the water company may charge is of more importance to the consumer than the minimum rate, for the reason that under the findings of the court (paragraph 4) the minimum rate established ''means the lowest price given or calculated in each of the three cities for a specified thing, being, in Chicago, a frontage of twelve feet; in St. Louis, the least desirable location for any kind of business; and, in Cincinnati, the lowest charge for area space, 500 square feet or less, accompanied by the minimum use of water.''

In the opinion of the court it is said: ''There can be no fixed rule in determining a maximum or intermediate charge. Much must depend on the integrity of the party applicant as to the uses for which he says he desires the water; and likewise much must depend on the fairness of the company supplying the water as to its charges.''

If, as the court found in paragraph 4 above quoted, the minimum rate is based upon the front-

age, locality, and space, accompanied by the minimum use, all or either of those elements may be applied by the company in determining when the service rendered should be paid for at the minimum rate, and the maximum or intermediary rate is left entirely to the discretion and fairness of the company. In other words, the company may not go below the minimum rate established by the court's schedule; but, in fixing a maximum rate for any service to a private consumer, it may go to the limit allowed by the court, thus consigning the private consumers to the mercy and fairness of the company.

We do not wish to be understood as intimating that the company would abuse the privilege granted it by the court, but simply announce the belief that, if the testimony warranted the above findings of the court, then the testimony was insufficient to enable the court to establish a schedule of rates, both minimum and maximum, which would be a compliance with the requirements of section 5 of the ordinance.

The brief of counsel for defendant is replete with statements to the effect that plaintiff failed to prove its case. To quote: ''It cannot be claimed that any evidence has been offered, or that any allegation has been made, to fix a schedule of rates. All that, as we were frequently admonished, which was attempted to be done, was to fix a minimum rate for certain items, leaving the remainder of the schedule untouched in every particular whatever. Was that making a case? Was that following the allegations of the complaint? Was that showing a right to equitable relief, or to any kind of relief? And yet the court was legally compelled to broadly state: 'These are the matters which were necessary to have been fully established by evidence, and these are the mat-

ters concerning which there has been an utter and absolute failure by the plaintiff.' "

Many other quotations from defendant's brief of like import might be made. In fact, the whole burden of defendant's brief and argument is to the effect that the company, having adopted a schedule of rates which was less than the contract called for, had kept, not only the letter, but the spirit, of the contract.

We believe that this contention of defendant is amply sustained by the evidence in this case, as a comparison of the two schedules shows that the rates established by the court for nearly one-half of the items in its schedule are higher than the rates established by the company; but under the issue presented by the pleadings such contention cannot avail, for the reason that there was no question of the justice or fairness or reasonableness of the schedule of rates adopted by the company in 1895 presented to the court below. The sole question was a determination of a schedule of rates which should be equivalent to the average rate prevailing in the three cities mentioned for the same service.

The theory upon which defendant tried the case seems to have been that, unless it could be shown that the schedule adopted by it in 1895 was wrong, such schedule should stand. No such issue was presented by the pleadings, and in our opinion no such theory is justified by the terms of the contract.

From our examination of the testimony in this case we are of the opinion that section 5 of the ordinance is unenforceable, in that it is utterly impossible to arrive at an equivalent of the average rate prevailing in the three cities mentioned for the same service, due to the fact that the schedules of rates prevailing in the three cities are based upon such radically different classifications and methods of computation, such a diversity of uses and services,

and are so largely determined by the judgment and discretion of employees of the water departments, whose duty it is from time to time to inspect, survey, and assess the premises to which water is furnished, and upon the reports of these employees the rates to be paid by the consumers are calculated by the employees of the office upon the schedules of rates prevailing.

In this conclusion we are abundantly supported by the position taken by counsel for defendant in his brief: ''We spent a number of weeks in the trial court—many people spent weeks elsewhere, so we are told—in attempting to arrive at an average. We said that it could not be made. We say to-day that it cannot be done. What better proof or demonstration of that fact is required than that schedule after schedule, no two ever agreeing, are tendered by the same plaintiff, under the oath of the same man, and figured by the same accountant. If it could be done, if it was a mathematical proposition, no two men should differ upon it, and certainly one man should not differ from himself. There is an inherent difficulty in the question, not put there by the intention of anybody, perhaps, but existing, it cannot be avoided or escaped; and that is that the three cities are so diverse in their methods and their classifications that you cannot put the three together and make the comparison Mr. Scobey told us of, and in his report he reported to the city council, and we called his attention to it when upon the stand, that anybody would say it was an easy matter to add three figures together, and divide by three, and get an average; but, as he then reported, that is not what is to be done. We find in St. Louis the room as largely the basis of the charge; we find in Chicago the front as largely the basis of the charge; we find in Cincinnati either rooms in residences or floor

space in stores and offices; and how they get these together, or to unite them so we can say this is the charge in Cincinnati, or the thing covered by a specific charge in St. Louis or Chicago, is a difficulty with which they had wrought, with the result they could not come to a conclusion."

To quote again: "Having tested, just as we tested in the courtroom throughout the many weeks of the trial, the inability of any accountant, however fair and unprejudiced and accomplished he might be, to go through these four schedules and arrive at an exact average in all these matters, the utter futility of the effort is no longer susceptible of doubt."

Again: "The plaintiff did not give the court material out of which to make a schedule; that is, there was no evidence going other than to a contention with regard to the minimum charge. How could the court, on such evidence, make anything else, apply any doctrine or principle to the minimum after it was obtained, under the evidence thus presented?"

And also: "The appellant only attempted to present evidence as to a minimum rate. Taking the evidence before the court, nothing else has been attempted by the appellant, either in pleading, evidence or tables. That is not making a schedule."

As to irrigation rates, there was no effort whatever made by the plaintiff to introduce any evidence which showed or tended to show that rates for irrigation existed in any one of the three cities mentioned. The only effort in this direction was to prove the rates established in the three cities for sprinkling sidewalks and streets and washing windows by means of a hose. The witnesses who testified for plaintiff from the three cities mentioned candidly admitted that irrigation, as understood and practiced in this

country, was unknown in either Chicago, St. Louis, or Cincinnati; so that it appears by the only testimony introduced by plaintiff that no schedule of rates existed in either one of the three cities for this service. And the court so found. Finding 11: "That the same service designated as irrigation of lots in Schedule A, which is attached to and made a part of the contract of April 10, 1890, does not exist in either the cities of Chicago, St. Louis or Cincinnati."

The court, in closing its discussion of "irrigation rates" in its opinion, says: "We would therefore, in view of what appears to us sufficient in the evidence, pleadings, and contract, decide that the classification as to irrigation is not subject to change, and while the evidence would justify us in raising the rate for irrigation, if such classification were found in the other three cities, we are led to conclude that the rate charged in the leaflet since November 1, 1895, is just, fair and reasonable, and the rate will remain at 22 cents per foot front." As before stated, the question of reasonableness, fairness or justice of the schedule of rates adopted by the defendant was not in issue, and cannot be made a basis of determination of what such rates shall be, under the express terms of the contract set out in section 5 of the ordinance of 1890; and such section does not except from its operation "irrigation rates," so that the court, as shown by its opinion, departed the issue presented, and promulgated a schedule of rates for irrigation, without any competent evidence whatever sustaining or tending to sustain such schedule.

From an exhaustive and laborious examination of the evidence in this case we arrive at the conclusion that the schedule of rates, with the exception of "meter rates," promulgated by the court in its decree, is not sustained by the evidence in the record,

and that with reference to more than two-thirds of the items in the schedule there is no competent evidence in the record even tending to support the schedule of rates decreed by the court, and that from the evidence in this case it is absolutely impossible to determine a schedule of rates which shall be the average of rates promulgated in the cities of Chicago, St. Louis and Cincinnati for the same service, using the words "for the same service" as meaning the items of service provided for and set out in "Schedule A," which is a part of the contract of 1890 existing between plaintiff and defendant in this case.

The schedule of meter rates promulgated by the court seems to be based upon sufficient competent evidence to justify the conclusion that it should be sustained, and we believe that a fair construction of the terms of section 5 of the ordinance of 1890, above quoted, would permit any customer of the water company to install a meter, and pay for the water consumed according to the schedule of meter rates promulgated by the court.

The amended complaint alleged that the rules adopted by the water company for the assessment and collection of its water rates were arbitrary and unreasonable. The answer denied that its rules and regulations were arbitrary or unreasonable, alleged that they were such as had been in force and effect under its predecessor and prevailed at the time of the adoption of the ordinance, or had been adopted by it subsequent to its acquisition of the property, pursuant to the rights conferred upon it by the ordinance.

Section 4 of the ordinance provided, in effect, that the water company should at all times furnish water from its mains to premises abutting upon the streets in which mains have been laid, "under such

rules as now prevail and such further reasonable rules as it may prescribe.''

Finding 6, above set forth, is to the effect that the rules and regulations of the water company were not harsh, oppressive or unreasonable. The testimony in the record abundantly supports this finding of the court.

The amended complaint further alleged that the obligations of the defendant company, under the ordinance, applied to the additions of Colfax, Highlands, South Denver and Barnum, and that the company was bound, under the terms of the ordinance, to furnish water to private consumers in the above towns under the requirements of the ordinance.

Section 1 of the ordinance granted the water company the right and privilege of laying its mains in the streets, avenues, alleys and public places of the city of Denver ''and additions thereto.''

In answer to this the defendant denied that the obligations of the contract applied or related to the additions, Colfax, Highlands, South Denver and Barnum, and alleged that those additions, or cities, at the time of their annexation to the city of Denver, and the private consumers thereof, were supplied with water under separate and independent contracts, and not under the contract of April 10, 1890; that the annexation or addition of the said cities or towns to the city of Denver could not abrogate the contracts or change or alter the same in any respect or particular whatever.

The evidence in the record abundantly supports the defense pleaded by the defendant company, and for this reason finding 10 hereinbefore set forth is sustained.

Our conclusion is that the findings of the court fixing the schedule of yearly water rates, except

meter rates, to be charged by the defendant company to its private consumers of water, and all other findings relating to the same subject, are not sustained by the evidence as found in the record, for the reasons herein stated, and that the decree of the court upon what is known as the first cause of action must be reversed, except as to meter rates.

The basis of the second cause of action alleged in the second amended complaint is the failure upon the part of the defendant to keep, observe and perform its duties, undertakings and agreements imposed upon it by section 6 of the ordinance, which is as follows: "Sec. 6. The said The Denver Water Company shall at all times furnish water to the city and to private consumers of a quality as good and fit for private consumption as that shown by the analysis made by order of the city of Denver by Prof. Joseph A. Sewall, in the month of August, 1889."

In support of this contention it was further alleged that the deaths in Denver, due to typhoid fever, very largely increased in 1896 over 1895, and were very much larger than the death rate from the same cause in other cities named, and that this increased death rate was directly traceable to the use of impure water supplied by the defendant.

The different sources of supply utilized by the defendant in its water system were specified, and it was alleged that the water taken from what was known as "Marston Lake" and from the Platte river and turned into the Mississippi street galleries was the contaminated, impure and unwholesome water introduced by the defendant into its waterworks system, and that such contaminated water, by reason of the fact that it was introduced into all parts of the system, rendered all of the water supplied by the defendant to the city of Denver and its private con-

sumers impure, unwholesome and unfit for domestic use. Thus the issue was limited to two sources of supply, viz.: Marston lake and the Platte river above the Mississippi street galleries.

The defendant's answer was a general and specific denial of all the allegations of the complaint, and also allegations to the effect that the city had failed and refused to keep its part of the contract, by failing and refusing to pay the defendant hydrant rentals as provided for by the ordinance.

In the view which we take of this case, the latter allegations are immaterial, and will not be considered. The plaintiff's reply denied all of the material allegations of new matter contained in the answer.

The taking of testimony upon the issue presented by the pleadings upon the second cause of action continued through several months and occupies about 1,400 pages of the supplemental abstract filed by the defendant in error. July 8, 1898, the court made its findings upon the second cause of action in favor of defendant, and rendered its decree thereon dismissing the second cause of action, at the costs of plaintiff.

It is impracticable to review the testimony taken upon this cause of action, and we cannot conceive that it would accomplish any good purpose to make an attempt to do so. The testimony has been considered with great care, and it seems to us that the findings of the court and the decree based thereon are amply warranted by the testimony preserved in the record. A mass of expert testimony was introduced, which was conflicting, as all such testimony is; but we are justified in saying that the plaintiff utterly failed to sustain the allegations of its complaint as to the impurity and unwholesomeness of the water which was being supplied by the defendant

to the city of Denver and its citizens for the period of time alleged in the complaint and for the period of time which the testimony covers.

As to the third cause of action, it was alleged that the defendant had not kept or performed the duties imposed upon it by section 8 of the ordinance, which is as follows: "Sec. 8. The said company shall at all times until the 1st day of May, 1891, keep and supply the said hydrants with an abundant supply of water for fire purposes under such pressure as it now gives, and after said 1st day of May, 1891, shall supply all of said hydrants and any hydrant which may be ordered to be set upon additional mains, as hereinafter in this ordinance mentioned, with a pressure equivalent, taking the elevation of the surface of the ground into account, to one hundred and fifteen pounds at the hydrant in front of the Union Depot in said city; provided, the city shall not be in default with the company upon any of its agreements; and provided, further, that if, owing to the extension and growth of the city, hydrants shall be ordered upon locations where, owing to the difference in elevation, there shall be less than forty-five pounds pressure, with a pressure of one hundred and fifteen pounds at the hydrant in front of the Union Depot, to the number of fifty or more, the said company shall put such hydrants upon a separate high service, and keep and maintain on each of said hydrants a water pressure of not less than fifty pounds."

The defendant denied the material allegations of the complaint as to this cause of action, and further alleged that plaintiff had failed and refused to keep the obligations imposed upon it by the ordinance, in that it failed and refused to pay the hydrant rentals provided for by the ordinance, and that plaintiff, at

the time of the suit, was indebted to the defendant on account of such rentals in the sum of over $145,000, and that the plaintiff had failed to comply with other provisions of the ordinance by it to be kept and performed, which are unnecessary to be stated or considered, in the view taken of the disposition to be made of the main issue presented by this cause of action.

The answer also alleged that at the date of the execution of the contract of April 10, 1890, its predecessor, The Denver Water Company, was pumping water by steam pumps and plants into and through its lowest mains to the higher points in the system; that the hydrant in front of the Union Depot was at or near the lowest point in its system; that during the year 1894 the system was changed from a pumping system to a gravity system, by which latter system the water was introduced into the mains at the highest point in the system, by mains connected with its elevated reservoirs, standpipes and storage basins, thereby maintaining a constant, abundant and inexhaustible supply of water throughout the whole system; that the diameter of its mains under the gravity system had been largely increased; that the quantities stored by defendant in its various reservoirs, after the adoption of the gravity system, had been largely increased, thereby insuring to the city of Denver a much larger and a more uniform and steady supply of water throughout its whole system; that the change from the pumping system to the gravity system was with the knowledge, consent and approval of the plaintiff; that at the time the contract was entered into by the predecessor of defendant the quantity of water supplied the city of Denver was about 14,000,000 gallons per day; that the quantity of water supplied by the defendant at the time of the trial was from 25,000,000 to 45,000,000 gallons

of water per day.   The reply of plaintiff put in issue the allegations of new matter in the answer.

The evidence in the case clearly established the fact that the pressure at the Union Depot was not 115 pounds per square inch, as required by section 6 of the ordinance, and that such pressure had not been maintained since the change was made from the pumping system to the gravity system.  It also appeared by the evidence that the city and its officers were fully advised of the change which had been made by the defendant in its system, that they consented to such change, and that, when it was suggested by the defendant that a change should be made back to the pumping system, such proposed change was violently opposed by the then mayor of the city, who said that he never would consent to such change if he could prevent it.   The evidence also clearly showed that by the change from the pumping system to the gravity system, by the enlargement of the mains of the water company, and by the increased supply of water stored in its various reservoirs, a very much larger supply of water was furnished the city for use in case of fires and conflagrations than was furnished at the date of the adoption of the ordinance.   The testimony of an expert witness as to the relative efficiency of the two systems, set forth in the abstract, is:  "Under the old system the hydrant at the Union Depot was supplied by a 6-inch pipe 260 feet long, which was fed by a 10-inch pipe, and under 115 pounds pressure the supply under this pumping system would be 2,820 gallons per minute. To-day the hydrant is supplied by sixty feet of 6-inch pipe, fed by an 18-inch pipe, and that under eighty-five pounds pressure would give 5,163 gallons per minute.   Practically 2,300 gallons more furnished on the pressure of the present system than the 115 pounds of the former system."

This testimony, taken in connection with that
of a former chief of the fire department, which was
to the effect that recent large fires had demonstrated
that an abundance of water was furnished, and that
fires of any consequence could not be successfully
handled without steamers to give the pressure, which
cannot be obtained by any other means, not even if
the pressure at the Union Depot amounted to 140 or
150 pounds, which testimony was uncontradicted,
justifies the conclusion, arrived at by the court below,
that the defendant had complied with that provision
of the contract which required it to furnish an abund-
ant supply of water which should be the equivalent
of a pressure of 115 pounds to the square inch at the
hydrant in front of the Union Depot. It abundantly
appears from the testimony that the water supply
of defendant, stored in its reservoirs at the time
of the suit, was many times the supply maintained
by The Denver Water Company at the time the con-
tract was entered into, and that the company had
kept pace with the growth of the city, so far as its
supply of water was concerned.

The findings of the court below were to the effect
that from the evidence it appeared that the defendant
company had not failed to comply with the require-
ments of section 8 of the ordinance, and its decree
based upon such findings, as to the third cause of
action, dismissed the complaint at the costs of plain-
tiff.

The findings of the court upon the second and
third causes of action were sustained by the evidence
introduced at the trial, and its decrees, based there-
on, will be affirmed. For the reasons stated, the
findings of the court below as to the first cause of
action, so far as the same relate to a schedule of
rates, except meter rates, to be charged private con-
sumers by the defendant, The Denver Union Water

Company, and the decree based thereon, are not sustained by the evidence introduced at the trial, for which reason the decree as to the first cause of action, except as to meter rates, must be reversed.

*Affirmed in part, reversed in part.*

CHIEF JUSTICE STEELE concurs in the foregoing opinion, except that he is of the opinion that the provisions of section 5 of the ordinance of 1890 are enforceable. Mr. JUSTICE CAMPBELL not participating.