THE PUBLIC SERVICE CORPORATION et al.

*v.*

THE AMERICAN LIGHTING COMPANY et al.

[Submitted March 14th, 1904.   Decided March 17th, 1904.
Filed July 9th, 1904.]

1. Corporations enjoying a gas franchise, and the complete or partial monopoly resulting therefrom, are bound to serve the public upon reasonable terms and at reasonable rates, and are similarly entitled to reasonable dealings from the public.

2. A foreign corporation having no franchise within the state, being neither a citizen nor a householder thereof, the sole business of which is the furnishing of a patent gas burner, has no standing, in its own right, to demand and receive a supply of gas from a domestic corporation for any purpose whatever.

*1 Robbins.* Public Service Corporation *v.* American Lighting Co.

3. Where a gas company, having a franchise and virtual monopoly, demands of a city an unreasonable price for gas, the city may offer a reasonable price; and, if the gas company refuses to furnish gas at that price, the city may obtain a *mandamus*, if the supply has not been commenced, or may sue in equity to enjoin the stoppage of a supply being furnished.

4. A gas company cannot be compelled to furnish gas to a city without its being measured.

5. The obligation of a gas company to supply a dwelling or tenement with gas, and for that purpose to lay down a supply-pipe and set a meter, is subject to the limitation that there shall exist a reasonable expectation that the consumption of gas will warrant the necessary preliminary expenditure.

6. Where the proposal and contract of a successful bidder for street lighting are based on the lamp, and not on the cubic feet of gas used, a demand by such bidder that the company controlling the gas supply shall furnish gas by the cubic foot is not warranted by its contract with the city.

7. A demand, conceding that it is on behalf of a city, by a foreign gas company having a contract with the city to furnish light for nine months, that the corporation controlling the supply shall furnish it with gas by the cubic foot, measured by a wholly unreliable standard, or else furnish and place its own meters, is unreasonable.

8. A corporation engaging to furnish light to a city is charged with knowledge of its disabilities, arising from differences with the company controlling the gas supply, to fulfill the contract, and should have first made investigation and arrangements with such company.

9. A corporation having a contract to furnish light to a city has no right to forcibly detach and remove burners used by the gas company, and attached to its pipes encased in the city's lamp-posts, and to replace them with its own lamps, but should have accomplished its purpose in a legal manner, either by contract with the gas company or by enforcement of the city's right to gas on reasonable terms.

On order to show cause why injunction should not issue. Heard on bill and affidavits on the part of the complainants and answering affidavits on the part of the defendants.

*Mr. Frank Bergen, Mr. William D. Edwards* and *Mr. Frederick J. Faulks,* for the complainants.

*Mr. Albert C. Wall,* for the defendant the American Lighting Company.

*Mr. Robert Carey,* for the defendant the city of Jersey City.

PITNEY, V. C.

The complainant, the Public Service Corporation, is the lessee for a long term of years, and in the possession as such, of the property of the other complainants, the Hudson County Gas Company and the Jersey City Gas Light Company.

The complainants own and control, and have been in the undisputed possession for many years of a gas manufacturing and distributing plant in the city of Jersey City, which distributing plant covers the entire city, and the companies are enjoying the franchise of laying and maintaining their gas mains under the surface of the streets of that city.

They have for many years supplied the householding inhabitants with gas for domestic use, and have also, for a like period of time, supplied the municipality with gas for street lighting purposes.

All gas for domestic purposes has been, and is, in accordance with common knowledge, delivered and sold by the cubic foot; the ascertainment of quantity being by gas meters placed in some convenient position on the premises occupied by the householder, where the same will be reasonably protected from injury by violence and also accessible to the agents of the company for the purpose of taking periodical "readings" thereof.

The lighting of the streets has been accomplished by annual contracts for lights of a certain candle power, furnished for certain hours according to a fixed schedule, varying with the season of the year, and paid for by the lamp and not by the quantity of gas consumed. But in the latter case the gas was turned on and off night and morning by the agents of the gas companies, so that they were able to control absolutely both the length of time the lights were burning and also the pressure of the flow of gas while burning.

It is proper here to say that the lamps were set in cast-iron lamp-posts owned by the city, but the gas was conducted thereto through ordinary gas pipes attached to the street main and leading from thence to the foot of the lamp-post and thence through the centre of the lamp-post by a "riser" to the top.

This gas pipe and the lamp, or burner, were all the property of the complainants.

. The only check which the city had upon the companies was a right to test and determine both the intensity of the lights produced and the number of hours they were maintained.

The contracts with the city ran from December 1st to November 30th, and a new contract was made each year. For that purpose proposals for bids were annually put out and advertised. But, as the complainant corporations enjoyed a practical monopoly, there could, in the nature of things, be very little room for competition. This, however, as I shall show further on, did not compel the city to pay any price that the gas company might be pleased to demand by its bid. The fundamental and cardinal principle being that all corporations enjoying a franchise of this character, and the complete or partial monopoly resulting therefrom, are bound to serve the public upon reasonable terms and upon reasonable rates, so that neither the public is at the mercy of the corporations enjoying the franchise nor are the corporations at the mercy of the public. Their dealing must all be subject to the test of reasonableness on both sides.

The defendant the American Lighting Company is a corporation of the State of Maryland and has no franchise whatever in the State of New Jersey or in the city of Jersey City, nor does it pretend to have any. It is simply the proprietor of what it claims to be a peculiarly meritorious light-producing lamp, or burner, which it claims will produce a much greater amount of light from the same amount of gas than the burner heretofore in use by the complainants and known as the "Welsbach Burner." By its affidavits it states that it has recently introduced its burners into several cities, including Baltimore, with great success.

This being its sole business, and, it not being either a citizen or householder of Jersey City, it has in my judgment no standing whatever in its own right to demand and receive from the complainants a supply of gas for any purpose whatever.

In this state of affairs the city of Jersey City, about the 1st day of December last, went through the usual process of mak-

ing a contract for lighting its streets for the year intervening between December 1st, 1903, and November 30th, 1904. Proposals were made by the city in the usual form, calling for proposals to furnish street lights at so much per lamp.

It appears by statements of counsel on both sides, though not shown by the affidavits, that bids were made by both the complainant and the defendant the American Lighting Company, which were rejected by the city, and fresh proposals on the same basis, viz., by the lamp, were asked.

A second set of bids were put in by the same parties with the result that the bid of the American Lighting Company was accepted, and a contract was entered into between the city and that company March 2d, 1904, for the lighting of the streets of the city at a certain sum per lamp.

I do not find, among the affidavits handed up, a copy of that contract; I find only the bid.

This contract for lighting, I understand, expires on November 30th, 1904, and that the complainant corporation furnished the lights for the months of December, 1903, and January and February, 1904, at the old rates. So that though the bid of the American Lighting Company was somewhat less than that of the complainant, yet, inasmuch as it was at the rate of so much per lamp per month, taking it from March 1st to November 30th, it is claimed by counsel for the complainants that it will in fact amount to a little more than the bid of the complainants for those months.

But this is a matter of no consequence.

As soon as the contract was signed, the American Lighting Company, claiming that it was satisfied that the complainants would not furnish it with gas, applied, on a bill and affidavits, to Judge Bradford, of the federal court, and obtained from him, on March 4th, which was Friday, an order to show cause, on the first Monday of April next, why an injunction should not issue in accordance with the prayer of the bill, which was to the effect that the defendants be restrained from discriminating between the American Lighting Company and other gas consumers in Jersey City, and from stopping the present passage

and flow of gas through said lamp-posts in Jersey City, and it contained *interim* restraint against such discrimination and against interfering with the passing and flow of gas to, in and through the lamp-posts situate in the streets, &c., and to the burners which are affixed thereto.

Under the protection of this injunction and the police force of Jersey City, the American Lighting Company proceeded at once, without stopping for the Sabbath, to detach the Welsbach burners and lamps owned by complainants from the lamp-posts of Jersey City, and to place instead thereof its own particular burner. All this was done against the protests of the complainants.

The latter applied to Judge Bradford, by telegraph, to be permitted to have an immediate hearing on the order to show cause, but were unable to procure the same, whereupon they applied to this court by bill, supported by affidavits, setting forth, briefly, the foregoing facts and praying that the defendants may be restrained from removing any of their gas lamps from their pipes in the said lamp-posts, and that the lighting company may be restrained from taking or using any of complainants' gas until reasonable arrangements have been made for measuring, metering or ascertaining the quantity of gas used, and that it may be required to pay in advance therefor before using.

On presentation of that bill, this court made an order to show cause, dated March 8th, 1904, returnable March 14th, 1904, on the defendants to show cause why an injunction should not issue according to the prayer of the bill, with *interim* restraint, against detaching any of the lamps of the complainants from the pipes in said lamp-posts, and from taking any of the gas belonging to complainants, without first causing the same to be measured.

On the return day affidavits were presented by the defendants, and upon these and statements made by counsel on each side, which were undisputed, the matter was submitted to this court.

I am entirely of the opinion that the defendant, the lighting company, has no standing whatever, in its own right, to demand

from the complainants a supply of gas, for the simple reason, above stated, that it is neither a householder nor a resident of Jersey City, and the obligation which is imposed upon complainants by reason of their enjoyment of a public franchise of laying mains in the streets to furnish gas, extends only to residential citizens of the city and to the municipality.

It is quite absurd to say that any person who might happen to be walking along the street, and yet be destitute of any local habitation within the corporate limits of Jersey City, has the least right to demand a supply of gas from the complainants.

I shall assume, however, for present purposes, and for present purposes only, what is not conceded by the complainants, that the lighting company, by reason of its contract with Jersey City, is entitled to demand a supply of gas for street lighting, to the same extent, precisely, that the city itself would be if it should determine itself to undertake the task of supplying burners or lamps, and of managing the same and purchasing the gas from the complainants.

Now the question is, what would be the right of the city under such circumstances?

We have seen that the right to demand and the obligation to furnish gas must be subjected to reasonable terms. One of those terms is that a reasonable price shall be paid. But, as before remarked, the city is not at the mercy of the gas-producing company; for, if the latter demands an unreasonable price, the city may offer what it conceives to be a reasonable price, and in case the gas company refuses to furnish gas at that price, the city has its remedy in the courts, either by *mandamus,* where the supply has not yet been commenced, or in equity for an injunction, where such supply is being furnished, to enjoin its stoppage.

The last remedy was, to my own knowledge, enforced by the late Vice-Chancellor Van Fleet, many years ago, in a case of a supply of water for fire hydrants, and has recently been applied by this court in a similar case in a cause now pending and unfinished.

As a part of this fixing of a reasonable price, a necessary and

essential element in the case of illuminating gas is the ascertainment, with reasonable certainty, of the amount consumed.

That gas is usually and almost universally sold by the cubic foot is common knowledge, as is also the fact that machines, called gas meters, are in universal use for that purpose.

The affidavits herein show that with the exception of the supply for street lights all gas supplied to consumers in Jersey City is measured by meters.

To hold that the complainants can be compelled to furnish gas to a city without its being measured, is to hold that private property may be taken for public use without just compensation.

But it is urged by defendants against the application of this rule in the present case, that it is not the custom to measure gas burned for street lighting purposes, and that it has not been done by the complainants in Jersey City; and it is further said, in that connection, that the quantity of gas flowing through a given aperture in a given time may be ascertained, with reasonable certainty, and by that means the amount which the city would use for lighting purposes be ascertained.

But the answer by the complainants to this contention is the following: They say that when they by contract furnish the light to the city by the lamp they burn their own gas and are directly interested in saving any waste thereof. They, by their own agents, turn it on, and are careful not to turn it on earlier than the contract requires, and that they can and do turn it off as soon as the contract permits. They have immediate possession and control of the cocks regulating the flow and they can and do see to it that no gas is permitted to escape and run to waste when the lights are not burning.

Then another element contained in the defendants' proposition is of great importance and must be noticed here, and that is that the amount of the flow of gas through an aperture of a certain size depends not only on the size of that aperture, which may be and usually is uniform, but upon the amount of the pressure, which is not uniform, and this is an element which it is absolutely necessary to take into account when determining the amount of flow of gas through a given aperture. This is undis-

puted and fundamental. It is also a matter of common knowledge, and not disputed by the defendants, that the pressure of gas at any time acting upon a certain aperture depends, in a great degree at least, upon the whole number of apertures open at that particular time and giving vent to the pressure of the gas in the general system of the mains.

In illustration of this it is only necessary to call attention to the common phenomenon of the increase of flow, or what is called "blowing" of gas from an ordinary burner in a dwelling at that time in the evening when people in that dwelling, and other parts of the city or town, are about retiring and extinguishing most of their lights.

An almost insuperable difficulty, then, in applying the rule of the size of the aperture, is the natural and necessary fluctuation in the pressure.

But, again, it is said that notwithstanding this objection the complainants have hitherto furnished the street lighting without meters.

The answer, again, is that they have done so at a price which is doubtless sufficient to cover the contingencies due to those fluctuations.

But, then, it is shown by the affidavits of defendants that they have introduced their lamps in Baltimore and other cities, by contract with the gas companies, by which the amount burned is ascertained in a particular manner, which, as I read the affidavits, amounts to a series of experiments to ascertain how much is actually burned during a given period and applying the "average principle."

The means so resorted to are not stated in the affidavits with sufficient explicitness to enable me to judge of their reliability. Moreover, it appears that the arrangements have been in existence for not more than a year or two, and therefore cannot be treated as having the endorsement of long experience.

But be that as it may, those arrangements were all by convention freely entered into by the gas companies without compulsion. Those companies had the right to make such contracts as they chose, and those cases, therefore, furnish no judicial

precedent for upholding the present demand of the defendant lighting company standing in the shoes of the city.

But the defendant goes further, and asserts and argues that when called upon to furnish gas by quantity it is the duty of the complainants to furnish and maintain their own meters.

Let us look at that proposition for a moment.

Admitting such to be the general rule, let us inquire whether it does not still, in the present case, contain the element of unreasonableness. Must not the demand for measured gas be reasonable? To illustrate: Suppose a person should rent for the three summer months a vacant lot in Jersey City, and facing on a street in which complainants had a gas main, and should place thereon a tent or erect a rough-board shanty, and then should demand of the gas company to excavate the earth and lay down a service pipe leading to the tent or shanty, and place a meter to supply the same, all at its own expense. Would anybody say that such demand was reasonable? Would the obligation of complainants, arising out of their exercise of a public franchise, extend so far as to compel them to excavate the earth and lay down a gas supply-pipe to that tent or shanty, place therein a meter, without proper protection, for the purpose of supplying gas for three months to such a tenant, who might, after all, not use any gas?

Suppose, again, a person should rent, from month to month, one room on the top floor of a many-storied building, which the owner had not thought fit to have furnished with gas pipes, and should demand of the gas company that it put in a pipe and "riser," through premises not belonging to it, to supply a single gaslight to a tenant from month to month. Would such a demand be reasonable?

In short, is not the obligation to supply a dwelling or tenement with gas, and for that purpose to lay down a supply-pipe and set a meter, subject to the limitation that there shall exist a reasonable expectation that the consumption of gas shall be sufficient to warrant the necessary preliminary expenditure?

I think there can be but one answer to these questions.

The principle that the element of reasonableness enters into

the practical application in each particular case of the obligation resting on the gas companies, was not seriously disputed by counsel of the defendants. But they say that whenever the city, which is a large customer, shall require that gas, to be furnished to it, or to its contractee, shall be paid for by the cubic foot, the duty rests upon the gas company to furnish its own means of measurement.

Let us consider the reasonableness of that proposition as applied to the present case.

By long usage, the complainants have furnished lights for the streets by the lamp and not by the cubic foot. All the apparatus for so furnishing street lights has been adapted to that mode. No provision has ever been made for furnishing or placing meters. Confessedly, it will be very inconvenient, if not absolutely impracticable, so to do. The city cannot, as does the householder, furnish a safe location for the meter—at least it has not done so. I make this last remark because I am well assured that a lamp-post has been and can be manufactured which shall contain within its shell a chamber for a meter.

I say not only has the city furnished no facilities for the placing of meters, but in its proposals for bids for street lighting for the present year, it called for bids by the lamp and not by the cubic foot of gas burned.

The proposals of the successful bidder were by the lamp and not by the cubic foot of gas used, and so is its contract. The demand now made by the lighting company for gas by the cubic foot is a sudden demand, and entirely unwarranted by any authority from the city.

Therefore, I cannot hold that in demanding gas by the cubic foot it is standing in the shoes of the city.

But waiving that. Supposing, now, that the city were demanding gas by the cubic foot, would it be reasonable for it to do so without giving any preliminary notice to the gas company, and without a special arrangement as to the price per cubic foot, and without having provided a place, either in a new lamp-post or in a receptacle beneath the surface of the ground, for the meter?

Would it be reasonable for the city, any more than for a private householder, to ask the gas company to furnish a meter for the supply of a single gas burner, though it burns an average of eleven or twelve hours a day?

Would such a consumption be a sufficient consumption to make it reasonable for the gas company to furnish a meter and supply gas at the same rate per cubic foot that it is furnished to householders, where several gas burners are in use?

I think not. I think such a demand unreasonable, certainly so, unless the complainants can be assured that the use of gas by the cubic foot shall continue long enough to warrant the initial expenditure for the installation of the meters.

Here we have a foreign company, which has a contract for nine months only, demanding that the complainants shall furnish it with gas by the cubic foot by a kind of measurement which I conceive and adjudge to be wholly unreliable, and therefore unreasonable, and asserting that if such measurement is not satisfactory to the complainants they must furnish and place their own meters.

This alternative, I consider, their contract with the city does not authorize it to make, and even if authorized by the city, it is inherently unreasonable.

One word more with regard to the defendant's proposed mode of measuring. In the first place, as the defendant will not be burning its own gas, it will have no pecuniary interest to serve by saving the gas—by care in not turning it on too early and in not turning it off too late. It will not find it necessary to employ a great number of lamplighters and light-extinguishers to go from one lamp to another promptly at the stated hours to light and extinguish the lights, but may use a less number by starting earlier in the afternoon and completing the extinguishing later in the morning.

Another consideration is that defendant proposes to make its profit in this transaction out of the capacity of its burner to make the greatest amount of light out of the consumption of the least amount of gas. Its interest, then, will be to pay for as little gas as possible and to be sure to obtain, at least, the full measure of gas for which it pays.

Again, the quality of the gas and its heat-producing power will come in question. If the light produced by defendant's burner does not reach the standard for which it contracts and promises, the disposition will be to attribute the failure to the quality of complainants' gas. These matters will be liable to give rise to continual disputes between the parties, and show the importance of the defendant relying upon being able to induce gas companies to adopt its lamp upon its merits, as it seems to have been able to do in certain other cities, and to abstain from attempting to force it on a gas company by the means resorted to in the present case.

Again, counsel for the defendant admitted that their peculiar lamp is never entirely extinguished; that it is turned down to a very small flame in the morning and turned up in the afternoon, so that a match is never used after once lighting the lamp, and that this is accomplished by a pair of strings hanging down the side of the lamp-post. So that the lamplighter or extinguisher, while standing on the ground, has only to pull one or the other of these strings to do his work.

It was not stated that these strings were protected from handling by any chance passer-by, and I can imagine no mode of so protecting them upon an ordinary lamp-post; hence I see nothing to protect the gas company against having its gas wasted by the interference of a mischieviously inclined person.

It was hardly contended by counsel for defendant that it was reasonable to cast upon complainants the obligation to provide against the several chances of waste above mentioned by employing a force of watchers to patrol the streets and see how long the lights were kept burning, and that the gas was not allowed to burn full blast in the daytime.

It is asked, if the foregoing views are correct, how is the defendant Lighting company to fulfill its contract?

To this I answer that the defendant must be charged with knowledge of its disabilities in that respect, and should not have entered into the contract without proper preliminary investigation and provision by convention with the complainants for its fulfillment.

It is further asked, what is the city to do, in the meantime,

for light? To this it is answered, and I think well answered, by the complainants, that they are willing to continue supplying the city with gas upon the precise terms of its contract with the defendant Lighting company, and I advised an order, March 14th, 1904, providing for such continued supply. This arrangement seemed to be satisfactory to the counsel for the city.

It is further argued that this is a mere contest between the proprietors of the Welsbach burners and the defendant Lighting company as proprietors of its burners, which it claims to be superior to the Welsbach burners.

This may be so, but it cannot affect the rights of the complainants herein.

It is said that they claim to be the owners and lessees of the four hundred and eighty Welsbach burners which they had installed and in use at the time of the intervention by the defendants. The desire of the defendants is to supersede the Welsbach burners and to install its own in place thereof, and before protection from this court could be procured it had succeeded in removing a large number of the Welsbach burners. I think the defendants were entirely unjustified in so doing.

The burners and the gas pipes to which they were attached, and which connected them to the gas mains, were all the property of the complainants. Their encasement in the lampposts of the city does not, in my opinion, result in their gift to the city nor to their dedication by the gas companies to a public use.

If the city desire to acquire the title to those gas pipes, they must take the proper methods so to do.

So with the Lighting company. If it wished to install its own lamps in Jersey City, it must either induce, in the ordinary way, the complainants to contract voluntarily with it for such use, or it must, standing in the shoes of the city, make reasonable arrangements with the complainants for the use of gas to supply them.

None of these conditions has been fulfilled, either on the part of the city or the defendant Lighting company.

For these reasons, I will advise an order that the restraint be continued until the final hearing of the cause.