### WEST et al. v. PROBST et al.*
### (No. 6872.)

(Court of Civil Appeals of Texas. San Antonio. Feb. 7, 1923. On Motion for Rehearing of Both Parties, Feb. 28, 1923. Further Rehearing Denied March 28, 1923.)

1. **Waters and water courses 🔑156(1)—Covenants in deed and grantor's declarations held to create an easement by implied grant to take and use water.**

Covenants in deeds and grantor's declarations as to lot purchaser's rights to water and sewer service which induced purchase of lots in proposed town site held to create an easement by implied grant to take and use water as long as the proposed water system existed.

2. **Easements 🔑15—How easement by implication may be created stated.**

An easement by implication may be created by showing a manifest intention that the use be permanent, necessary, and beneficial to the grant, continuous, and self-acting in contradistinction to any idea that it might be discontinued and used only for a time.

3. **Easements 🔑15—Quasi easement must be in use at time of grant to establish requirement of permanency affecting grant by implication.**

It is ordinarily essential that a quasi easement be in use at the time of the grant to establish its requirement of permanency, affecting grant by implication, but, where grantor had full knowledge of its existence in exploiting sale of town lots, such use was not necessary.

4. **Easements 🔑15—By implication must be in land.**

An easement by implication must be in land, not in personal property nor in an operating business required by the hand of man to perfect or indicate its use.

5. **Waters and water courses 🔑154(1)—Dominant and servient estates must be contiguous.**

Where the exploiter of a town site owned the soil in the streets and alleys in which he reserved exclusive right of way for his water system pipes, and by the sale of lots created easements to take and use water, it fulfilled the requirement that the dominant and servient estates be contiguous.

6. **Easements 🔑1—Classification as continuous and apparent no part of the definition.**

Classification of easements as continuous, apparent, and nonapparent is no part of the definition.

7. **Deeds 🔑117—Presumed that grant carries with it things necessary to its beneficial use.**

He who grants a thing is presumed to grant whatever is necessary, as an incident thereto, to its beneficial use.

8. **Waters and water courses 🔑156(5)—Easement to use water did not require operation of plant at rates amounting to confiscation.**

Where by implication easements were created in lots purchased in a town site to take and use water from the water system for as long as the system remained, notwithstanding that grantor reserved no right to arbitrarily and without cause remove the system, held, that grantor could not be required to operate the system at rates that amount to confiscation.

On Motion for Rehearing of Both Parties.

9. **Waters and water courses 🔑203(12)—Court of Appeals may not fix water system rates, but may determine reasonableness.**

The Court of Appeals has no power to fix rates for a water and sewer system, but may determine as to the reasonableness thereof.

10. **Waters and water courses 🔑203(12)—Dispute as to what is reasonable rate for water system not reason for receivership.**

A dispute as to what constitutes a reasonable rate does not justify the appointment of a receiver without notice to take charge of a waterworks system and oust the owners.

Appeal from District Court, Live Oak County; M. A. Childers, Judge.

Suit for injuncion by Joe Probst and others against George W. West and others. Judgment for plaintiffs, and defendants appeal. Reversed and remanded.

Dougherty & Dougherty and Beasley & Beasley, all of Beeville, and Denman, Franklin & McGown, of San Antonio, for appellants.

L. D. Stroud, of Beeville, and Gordon Gibson, of Fort Worth, for appellees.

COBBS, J. This suit was brought by Joe Probst and other appellees, on behalf of themselves and all other property owners in the town of George West similarly situated, against George W. West, the George West Water & Light Company, and the George West Sewer Company, to establish and enforce the alleged rights of plaintiffs in the water and sewer systems built in the unincorporated town of George West by said West individually. A receiver was appointed by the trial court upon application of appellees to take charge of and operate the system. The trial was had before the court without a jury, and the court made and filed findings of fact and conclusions of law. The judgment, among other things, was as follows:

"It is therefore ordered, adjudged, and decreed by the court that the plaintiffs, Joe Probst, I. J. Dowd, Ben S. Brown, and M. G.

Bartlett, each individually in respect to his said several lots in the town of George West, do have and recover of and from the defendant George W. West and of and from the George West Water & Light Company, a corporation, and the George West Sewer Company, a corporation, the right of easement attached to their said several lots as a dominant estate to take and have and use water from said above-described water and sewer plant for domestic and general purposes at the rate of charge hereinbefore fixed, not exceeding $2.75, and 50 cents for each 1,000 gallons in excess of the minimum for 2,000 gallons, so long as said water and sewer systems are operated by the defendant George W. West or by the said defendant corporations or their assigns or agents, and that the receiver hereinbefore appointed, J. R. Secrest, or any successor to him, as such, shall deliver and surrender to the said defendants said entire water and sewer systems upon demand by said defendants at any time within 20 days from the adjournment of this term of the court, but that until such demand and surrender the said J. R. Secrest, as receiver, shall continue to operate said water and sewer plant systems, care for and control the same, subject to the orders of this court, and to collect and receive said water and sewerage rates hereinabove specified, and the said receiver shall have authority to deny to plaintiffs or any other consumer such water supply and service unless said water rate is paid or tendered for all water used for each and every month and before the tenth day after the first day of each and every month such service is given, and the said receiver is hereby authorized and directed, when so acting, to collect from each and every consumer from and after his appointment, heretofore made, for all arrears due at the rate of $2.75 per month and said rate in excess, and to that end he may demand the same and bring and prosecute any suit necessary therefor, and said receivership is now continued in force under the terms herein specified, pending the appeal herein, if any shall be given on such appeal, as required by law, to suspend the judgment of this court, but, if such supersedeas bond shall not be given, and in the event such property shall not be surrendered to the defendant George W. West and the defendant corporations under the terms hereinbefore recited, then such receiver shall report to the next regular term and each succeeding term of this court all of his actions taken in the premises, all receipts and disbursements, expenses, and the status and condition of the property at that time, to the end that he may be finally discharged.

"It is further ordered, adjudged, and decreed by the court that upon the termination of the receivership, as herein specified, or in the event of either of said defendants executing an appeal and supersedeas bond and demanding possession of said property, that should said defendant George W. West and two defendant corporations, or some one of said defendants, fail or refuse to operate said plant for the supply of water and sewerage service to the consumers in the town of George West, then and in that event the plaintiffs, Joe Probst, I. J. Dowd, and Ben S. Brown, and M. G. Bartlett, may peaceably enter upon the said servient estate, take possession thereof, and operate the same for their own use and benefit, and

for all other consumers of water in said town of George West, by such means as they may devise and At their own expense, and take over, use, and care for said property only in such manner as to retain the uses of their said easements at the specified rate, and it is further ordered, adjudged, and decreed that, should the named plaintiffs operate said plant, the same shall be so operated for the benefit of all consumers of water and sewerage service in the town of George West at a uniform rate and in accordance with the regulations hereinbefore pronounced regarding said service, and that they may so continue to so operate, use, and enjoy the same until such time as that the defendants, George W. West, the George West Water & Light Company, and the George West Sewer Company, or some one of them, shall, by action brought in a court of competent jurisdiction, establish their ability and right to take over, control, and operate said plant.

"It is further ordered, adjudged, and decreed by the court that the defendants, George W. West, the George West Water & Light Company, and the George West Sewer Company, each a corporation, be, and the same are hereby, perpetually restrained and forever enjoined from removing, injuring, or in any manner impairing the said uses of said property, and that they, said defendants, and each of them, shall be, and are hereby, restrained from removing and taking away from its present location any of the parts of said water and sewerage plant or anything or things necessary and heretofore used in supply to the consumers of the town of George West.

"It is further ordered, adjudged, and decreed by the court that, in the event all or either of the defendants George W. West, George West Water & Light Company, and the George West Sewer Company, corporations, shall undertake to control and operate said plants, and so long as they shall do so as hereinbefore provided, they and each of them are hereby enjoined from shutting off or denying water supply and sewerage to any consumer, including the four named plaintiffs, when such consumer shall pay the rate herein established.

"It is further ordered, adjudged, and decreed that the plaintiffs shall have all necessary writs and processes to enforce this judgment, and that plaintiffs shall have, and do hereby have and recover, all costs incurred in the prosecution of this suit of and from the defendants, George W. West, George West Water & Light Company, and the George West Sewer Company, the last two named corporations."

It is not necessary to describe the pleadings of the parties, offensive or defensive, as they are quite sufficient to clearly present the theories of either party.

The first contention made by appellant is that the court erred in adjudging to plaintiffs an easement in their respective lots to take and use water from their respective systems because there is no evidence to support such a judgment. The material provisions of the deed substantially provided, among other things: (a) Within 12 months the grantee shall erect improvements in value not less than the purchase price; (b) shall connect the improvements, including all baths, clos-

ets, sinks, etc., with the sewer system in said town within 30 days after said improvements are occupied; (c) and after the sewer mains are laid in a street or alley in the rear or front of the lot the grantee shall not establish or allow any privy, vault, or other outhouse on said property; (d) and thereafter shall not dig, erect, or allow on the land any cesspool, cistern, or other thing in which water may collect to be taken or used. From these conditions in the deed, in connection with other verbal and written declarations, contemporaneously made, inducing the sale and purchase of the land, it is claimed: (1) An implied grant, arising from necessity; (2) an express grant according to the terms of the uniform deed read in the light of actual conditions existing at the time of its execution; and (3) because of the representation of West acted upon by plaintiffs to their detriment in making the purchase West is estopped to deny that the easements were in fact appurtenant to the lots purchased.

It is further contended the provisions for forfeiture in the event of violation of any of the above conditions grant a negative easement to each owner of any lot to have the conditions faithfully carried out and performed with reference to each lot, with the right to bring suit to enforce performance granting the corresponding right of forfeiture "only in the grantor or his heirs."

[1] From a careful examination of all the authorities presented by both parties it is clear to us that there arises from the covenants in the deed and the declarations of the grantor, verbal and written, in connection with the deed, an easement for the benefit of those who hold conveyances to secure the benefits, at least by implied grant, arising from necessity as long as the system exists. "It is admitted that on or about the time West placed the lots in town site on the market he had prepared and printed in large numbers a map or plat of said town site largely identical with the recorded plat thereof, but inclosing additional land and containing additional matter, such as the proposed prices of the several lots and the like, which said plat showed an added block on the west-southwest side of said town site, outside of its limits as shown by the recorded map, which said block on the said just mentioned map is bounded by Pecos street, the extension west-southwest of Houston and Bowie streets, and an unnamed street, and wherein appears the following words and figures: 'Well 500 feet deep. Water standing within 30 feet of top of ground. Will furnish 2,500,000 gallons of pure fresh drinking water a day.'" There is much testimony aside from the conveyances introduced in evidence showing the inducements that were intended to secure purchasers of the George West town-site property. "Mr. Casey identified two letters written by George West,

addressed to the citizens of Live Oak county, dated November 24, 1913, and December 1, 1913, in which appear the following statements, among others: That if the county seat is moved from Oakville to George West at the election of December 6 (1913), 'that I will build an electric light plant, and waterworks system and a sewer system and an ice plant adequate to accommodate and supply a town of 5,000 people. * * *. I will supply accommodations for as cheap a price as any other town in Southwest Texas where the sewer system is not owned by the town itself. * * * The water rate will be as cheap as in any town in Southwest Texas.' Plaintiff Bartlett identified a series of advertisements which appeared in the San Antonio Express, all of which were introduced in evidence, occupying about 35 pages of the statement of facts, and are of date from July, 1914, on. These advertisements, which appear on pages 194 to 229 of the statement of facts, practically without exception refer to the waterworks system and the sewer system, and point out the advantages which will accrue to the town by reason of such installations. The advertisements all dwell on the high grade, modern character, and permanent nature of the improvements. They include appreciations of Mr. West; statements as to his great wealth, fine character, and his ability and determination to carry out all that he undertakes."

As said in Fayter v. North, 30 Utah, 156, 83 Pac. 742, 6 L. R. A. (N. S.) 410:

"Whether or not the artificial arrangement of the material properties of his estate by the owner constituted a technical easement is, under the facts and circumstances of this case, immaterial. It clearly created a condition to the land sold partaking of the character of an easement, constituting at least a quasi easement, visible to the purchaser, and one of the things in the minds of the parties when the bargain of sale was made. * * * The presumption of law is that the parties contracted with a view to the condition of the property as it actually was at the time of the transaction, and after sale neither one had a right, without the consent of the other, to change that condition, which openly and visibly existed, to the detriment of the other."

[2] An easement by implication may be created as was done here by the severance of West of the unity in the ownership in the estate, conveyed by his conveyance and that before such separation in the unity of the ownership took place, the use should have been acquired and took place showing a manifest intention that the use should be permanent. Further that the use was necessary and beneficial to the grant, continuous and self-acting, in contradistinction to any idea that it might be discontinued and used only from time to time.

[3] So also it is ordinarily essential that the quasi easement be in use at the time of

the grant in order to establish its requirement of permanency, but this is not necessary when, as in the instant case, the grantor had full knowledge of its existence in exploiting and promoting the sale of the town lots of which he was the sole owner, on the faith and credit of the system of waterworks installed or to be installed and operated in the interest of the inhabitants of the town he was to or had established. Whatever rights that Mr. West reserved to himself, for a valuable consideration, he conveyed town lots impressed by very valuable water rights that cannot be impaired or destroyed unless such reserved rights were firmly placed as a covenant in the deed of equal dignity with any right he passed to his vendees under the very terms of the same instrument.

The minds of the parties must meet upon some basis that shall be binding mutually to that extent. Obviously Mr. West was well informed of his own interest and purposes in reference to said town and its future, and hence the servitudes or quasi easements were not only known to him, but notorious and plainly visible from their character. He broadly advertised them, proclaiming their existence and advantages, and it is plainly apparent that the rights are of necessity continuous. A. K. & N. Ry. v. McKinney, 124 Ga. 929, 53 S. E. 701, 6 L. R. A. (N. S.) 436, 110 Am. St. Rep. 215; Brown v. Burkenmeyer, 9 Dana (Ky.) 159, 33 Am. Dec. 541; Corpus Juris, Easements, pars. 6 and 7, and notes; Fayter v. North, 30 Utah, 156, 83 Pac. 742, 6 L. R. A. (N. S.) 410; Fetters v. Humphreys, 18 N. J. Eq. 260; Harrison v. Boring, 44 Tex. 255; Hunstock v. Limburger (Tex. Civ. App.) 115 S. W. 327; Larsen v. Peterson, 53 N. J. Eq. 88, 30 Atl. 1094; Miles v. Bodenheim (Tex. Civ. App.) 193 S. W. 693; Miller v. Skaggs, 79 W. Va. 645, 91 S. E. 536, Ann. Cas. 1918D, 929; Ruling Case Law, Easements, pars. 22, 25–27; 2 Tiffany on Real Property (1920 Ed.) par. 366c, p. 1326; Warren v. Blake, 54 Me. 276, 89 Am. Dec. 748; Washburn on Easements and Servitudes (4th Ed.) par. a, p. 3; Watson v. French, 112 Me. 371, 92 Atl. 290, L. R. A. 1915C, 355.

These easements are incorporeal and sought to be imposed on corporal property, and not upon profits arising from the use of the property and for the benefit of corporal property. We find two distinct tenements, such as the dominant, to which the rights belong, and the servient, upon which the obligations rest—not sought to be imposed upon George West personally but upon the two corporations, seeking to receive through said systems the water and sewer service without any binding personal obligation for service or the rights to participate in profits, if any, arising from the operation of these plants their rights limited to receiving water and sewer service belongs, and thus the servient estate which is the water and sewer systems which is the obligation to furnish water and sewer, vests.

The proof showed that West was the owner of a large body of land consisting of some 75,000 acres of unimproved land, and that he set aside, mapped, and platted into town lots 160 acres thereof as the town site of George West, and set aside some 12,000 acres in small farm lots to be sold by him. He secured the removal of the courthouse site to George West and caused the erection of the courthouse and other public buildings, such as hotels and schoolhouses, in the town, and put in a system of waterworks, built and erected water towers, and put in a modern system of waterworks at a cost of something like $70,000 adequate to supply a city of 5,000 inhabitants, all together at a cost to him of about $400,000. These town lots were put upon the market and many sold. West applied all the money received for the sale of the town lots and sale of the 12,000 acres of farm lands to this enterprise and applied other sums from his private means to the same. He operated the waterworks system for several years without charge.

To this point West surely met the heavy burden he assumed. The people who purchased those town lots did so upon the clear inducements West offered. West makes the contention with great force, among other things, that because the use of the system is dependent on continuous operation by skilled workmen, just as a gin cotton factory, electric light plant, etc., and by the hand of man, no continuous easements could arise by implication.

[4] It, of course, must be in land, not in personal property nor in an operating business required by the hand of man to perfect or indicate its use, and in support of this contention cites Bouldin v. Miller, 87 Tex. 367, 28 S. W. 940; Howell v. Estes, 71 Tex. 690, 12 S. W. 62; Miller v. Clary, 210 N. Y. 127, 103 N. E. 1114, L. R. A. 1918E, 222, Ann. Cas. 1915B, 872; Lakewood Heights Co. v. McCuistion (Tex. Civ. App.) 226 S. W. 1111; West v. Giesen (Tex. Civ. App.) 242 S. W. 312.

[5] There is much force in appellants' contention, and it "almost persuades us." But the facts in this case distinguish it from the contentions of appellant, and the deduction he draws from the facts for this case meets the requirement that the dominant and servient—quasi—be contiguous, because West owned not only the soil in the streets and alleys subject to the right of way for travel, but reserved the exclusive right of way for his water system of pipes, and expressly reserved the exclusive right to lay pipes. Thus the estates were contiguous. These pipes were necessary for passing the water from his water tower to the lots, such being necessary to the enjoyment of the

servient or quasi in its existing condition, so that it may be presumed he intended to convey the estate accompanied by the easement.

[6] In considering the technical distinction between continuous, apparent, and nonapparent easements such classifications are no part of the definition of easements.

[7] In construing the grants or coveyances under discussion we must adhere to the ancient and well-established rule of construction and apply it to the conveyances of Mr. West, "that he who grants a thing is presumed to grant whatever is necessary, as an incident thereto, which is necessary to its beneficial use." This is important to determine whether an easement passed. Washburn on Servitudes and Easements (4th Ed.) 31; Elliott v. Rhett, 5 Rich. (S. C.) 405, 57 Am. Dec. 750.

Here the grantees were compelled by necessity to take the water for consumption and for the disposal of sewerage from appellants' waterworks because the grant of West prohibited them also from digging wells on their lots. So to give it any other construction would be in derogation of the grant or allow the grantor to contradict his own grant.

The waterworks and sewer system constructed at George West are made equally apparent not only alone in the deeds, which were then within the minds of the parties, but by the visible and permanent character of the structures and the platting of the land and its inclosures and designation as a block upon which the well is situated and upon which the most prominent structures were erected.

The waterworks and its supporting tower are about 100 feet high and rest on solid concrete foundations and connected by pipe, and thence to every block of pipes made accessible to every block and lot in the town site. There are water plugs which are visible attached to the conveying pipe throughout the town site.

We think the facts in this case clearly distinguish it from any cases cited by appellants. West created in his town a strict necessity for an easement in his will, located on the block marked on his maps for that purpose with its tower, pump, and with pipes running through every street making his deed declare the "intention that occupants shall use water exclusively from said waterworks system." The burden to supply is not on Mr. West, but is on the well, to whom the water taker must look, and therefore differs from appellants' cited cases in that the obligation to supply them was a personal obligation, whereas here there is no personal obligation upon any one to do so, and every dollar furnished this system was out of the bounty of West.

[8] While we hold that appellees have such an easement in that well, to receive water as long as it is operated, we do not by any means intend to hold that West or the corporations created by him, to whom he assigned the properties, appellants here, may be made to operate the same at rates that amount to confiscation. When appellees purchased their lots, it was with full knowledge of the character of the improvements. It is contended, if appellant would put in a new and cheaper system, the plant may be operated at a cheaper rate such as was done by the present receiver. We cannot agree with this contention. This town grew into existence under the apparent knowledge that the system was to remain as it was, with the hope, we feel assured, that it was contemplated by all its inhabitants and prospective purchasers that the time would come when they would see a city of 4,000 or 5,000 inhabitants and many water takers and consumers instead of, as now, only about 200 inhabitants and about 40 water takers. Thus we see the fond dreams of West destroyed, as well as all the others. We know of no law, and none is cited that can require West to remove the costly system put in by him as a part of the town's plan and substitute other improvements at his cost to furnish the water required at a price that would justify the situation and destroy the present one. The alternative is presented. Unless you inaugurate a cheaper system to bring us cheaper water, we will through the courts take charge of your property and do that for ourselves.

Such a right is not possessed by any covenant in the conveyances nor imposed on West thereby or by any law, but, looking at the conveyances, it is quite to the contrary. Indeed, his property in the least iota, cannot be taken and appropriated to private or public use without just and adequate compensation. No title to any of the property belonging to the waterworks system as such was vested in any vendee of West. The title to this property was never passed out of appellants. The appellees only had, as shown, an easement or use to and in the water system—the well.

Under the terms of the conveyance, West is not obligated to operate the system for any definite period, but to furnish water as cheap as certain named towns furnish the same when he does operate. There is no covenant that this shall be for an indefinite period or forever, nor is there any provision that his vendee may take over the plant and operate it for any indefinite period without adequate compensation to him.

The rights of the parties in respect to the operation of the plant when the owner declines to go on, when to do so would still further involve him in loss, are not embraced in any covenant between the parties. The existence of just such a complication and its solution is not presented by any authority that aids in the solution, but the trial court predicated its judgment upon Hunstock v. Limburger (Tex. Civ. App.) 115 S. W. 330.

Appellants contend they have the right to withdraw their property from the public use under the authority of Brooks-Scanlon Co. v. Railway Co., 251 U. S. 396, 40 Sup. Ct. 183, 64 L. Ed. 323, on reasonable notice.

Appellees have presented a very strong argument and supported by authority that such covenants as appear in the appellants' conveyance are too indefinite and uncertain as to the length of time appellants are to furnish water and do not indicate the character of system that was to be built, how maintained, what it was to cost, or how much water will be furnished, to how many people, how long, and at what price, contending the statement that water will be furnished at as low a price as in any like town in Southwest Texas does not limit the time for which such service will be continued at such price, nor sufficiently define the area included in such statement, citing McQuitty v. Harton (Tex. Civ. App.) 149 S. W. 777; Denver v. Denver Union Water Co., 41 Colo. 77, 91 Pac. 918; Childs v. Columbia, 87 S. C. 566, 70 S. E. 296, 34 L. R. A. (N. S.) 542; Echols v. Railway Co., 52 Miss. 610; Texas & Pac. Ry. Co. v. Marshall, 136 U. S. 393, 10 Sup. Ct. 846, 34 L. Ed. 385; Jones v. Newport News & M. Valley Co., 65 Fed. 736, 13 C. C. A. 95; Barney v. Indiana R. Co., 157 Ind. 228, 61 N. E. 194; Baldwin v. Kansas City Co., 111 Ala. 515, 20 South. 349; Childs v. Columbia, 87 S. C. 566, 70 S. E. 296, 34 L. R. A. (N. S.) 542.

A careful reading of those authorities are not in point on the precise question here. The water works system is very plainly described and defined. While no time is fixed for the determination of the contract to furnish the water, it is fixed by inference and implication to be as long as the system remains, and West reserved no right to arbitrarily and without cause remove the same. Appellants are bound to supply the water to the consumers so long as the system is operated and the price is paid. There is nothing in this partaking of a perpetuity obnoxious to the law, as appellants insist.

In the absence of any definite contract establishing the rights of the respective parties, by analogy we must proceed to adjust those rights within the purview of those decisions, the foundation for rate making in cases of public utilities. Ordinarily such provisions as are in the contracts prohibiting the grantee from digging wells upon their own property might be held void, but such holding would not aid in the solution of the appellees' claim of an easement. The very fact that they were inserted created the very necessity. West denied that went to create the easement.

There is no argument of appellees to the effect that, if there was a smaller system put in, and the system operated more cheaply, it could be operated on a rate of $2.75, instead of $8, as contended for by West. This would mean that West would lose the $70,000

it cost him to put in operation the system. The owners of such property performing such services are entitled to earn reasonable rates on the investment. "Plaintiffs' own witness, qualified by them as an expert on the question of water rates, etc., testified that he had had long experience in the business; worked at Kansas City, San Antonio, Brownsville, Beeville, Victoria, Edinburg, and the surrounding country; that he was familiar with the operation of such systems, etc.; that he was superintendent of the Beeville plant; that he knew what a reasonable rate for the town would be; that the systems at George West were well and economically built; that their confinement to only 160 acres was economical. He testified in detail to the various expenses of the plant, including cost of operation, repairs, and depreciation, stating that: 'Assuming there are 50 patrons chargeable with this fixed charge entering into the reasonable rate, $14.70 per month is approximately the amount chargeable to each one, according to my figures, in order to meet the fixed charges entering into the reasonable rates to avoid ultimate destruction of the plant's a charge of $14.70 based upon actual calculation is correct.' He stated: That the town of Beeville is a town of about 5,000 people, and Kenedy of about 3,500. That Beeville operated, in connection with its water plant, a light plant and an ice plant also, and that it is a well-known fact that the ice plant carries the burden of the water plant, and that the water plant has been a continuous losing proposition. 'The water plant, at the rate they have been charging over there, couldn't exist 30 minutes. The rate charged by the water plant is $2.25.' That the sewer system is independent and is not included in that charge. That, in spite of the help from the ice plant, the whole system has been falling into a state of absolute disrepair because the rates did not provide funds for unkeep, etc., and that, in spite of the help of the ice plant, the company had been insolvent, and its plant was sold under the hammer. That, if it did not have the support of the ice plant, 'it would be necessary, in order to keep it going, to have a charge of $7.50 to $9.50 a month,' and that even then there would be no return whatever upon the investment. That in Kenedy the water plant is dependent upon the ice plant. That the Edinburg plant is in its infancy. That it has started out with a $2 rate, but that, 'judging from my experience and my observation of rates, * * * it is necessarily headed for the rocks.' That in the town of Beeville many persons by preference have their own wells and windmills."

In such dilemma what is the solution? We submit that the only solution is that the right then arises to discontinue operation and withdraw the property from public use upon reasonable notice. There is no machin-

ery by which the courts could compel the perpetual operation of properties at a loss even if the Constitution did not forbid it. It then must devolve upon the courts to fix a rate if the parties cannot agree, and that the rate must be based upon the value of the plant and its maintenance in connection with the reasonable cost of operating the same economically, so as to bring some reasonable return of the investment and cost of operating. If the appellants are not then willing to operate the same for such charges, the appellants may with appellees' concurrence take over the same by paying its reasonable value, to be determined by a fair commission or committee of experts to fix its value, and pay for it and then operate it. If that cannot then be arrived at, then the appellees may remove improvements, and that provision in their deeds requiring them to take water from said system be set aside and held for naught.

The facts in this cause are not sufficiently developed as to cost of and the operating thereof for us to determine what rate in good conscience and fair dealing shall be fixed. The judgment will therefore be reversed and remanded for another trial on this sole issue. The costs of this appeal will be divided between the respective parties.

## On Motion for Rehearing of Both Parties.

It is well enough in replying to appellants' motion contending we erred in holding that appellees had an easement to quote from some of the provisions of appellants' deed. It will also be seen that some of the covenants of the deed absolutely contradict certain statements made by appellees in their motion for a rehearing. Some of the covenants are:

(a) The deed required that the grantees connect their improvements, "including all baths, closets, kitchens, sinks, etc., * * * with the sewer system in said town."

(b) The "said grantee, his heirs or assigns, shall not establish or allow any privy, vault, or other outhouse of similar character on said property or any part thereof."

(c) "Nor dig, erect, or allow on said land or any part thereof any well, cesspool, cistern, or other thing in which water may collect or from which it can be taken or used, it being the intention that the occupants of such property *shall use the water exclusively from the waterworks system contemplated to be erected in said town.*" (Italics ours.)

(d) It was further provided that the "failure to strictly keep and observe either or any of the foregoing conditions by the owner or by any tenant, lessee, or other occupant of said property or any part thereof with the owner's consent shall work as a forfeiture of the title to the particular subdivision of property, such as lot or block," etc.

(e) The *right* is granted to each owner "*to bring any suit or take out any legal process that may be proper to enforce the performance thereof,* * * * *the right or easement to*

*have said conditions strictly complied with,* and such right to exist in the owner of each lot as to all other lots in said town, * * * *the object of said conditions being mainly to promote the peace and health of the community,* * * * but the warranty hereinabove expressed is not to be construed as extending to the easements and right granted in this paragraph." (Italics ours.)

(f) "It is expressly provided that no forfeiture of title can be had (against grantees) for failure to comply with either of said conditions (of forfeiture against grantees) unless and until the party or parties operating the *sewer systems and water system established reasonable rates or until rates are established by the authorities having power to establish such rates from time to time under the law.*" (The italics are ours.)

Independent of the discussion made by us in the original opinion to show the existence of an easement to appellees and those similarly situated, a reference to this deed makes the proposition clear.

West bound the vendees to everything necessary and important for him to have to put in the system to compel them to take the water, etc., 'from the same system upon pain of forfeiting their holdings. So it follows by necessary implication, a corresponding obligation, that West would furnish the source of supply. The contract was mutually binding, so that his vendees should not be "bound forever, and he only for a day."

Indeed, the contract well guarded the easement rights of the vendees, but there is no express method fixed whereby to determine what are reasonable rates, though the very last paragraph of his deed provides two alternatives. The first is that the parties "operating the sewer system and water system establish reasonable rates." This was done supposedly by the sewer system, and appellees contest them, say they are unfair, unjust, and unreasonable, and threw the property in the hands of a receiver to operate and fix rates for them. The second and final method provided for in the conveyance is to be "established by the authorities having power to establish such rates from time to time under the law." Appellee contends no court can establish rates. That must be done by the Legislature. Then to what authorities does this covenant refer to to fix the rates?

George West caused the "George West Sewer Company" to be incorporated under the laws of this state by filing articles of incorporation in the office of the secretary of state on the 7th day of September, 1916. He likewise caused the incorporation of the "George West Water & Light Company, by filing articles of incorporation in the office of the secretary of state on the 16th day of August, 1916. On the 4th day of August, 1915, he conveyed to "George West Water & Light Company" all the property belonging to that system in the George West town site by full description, and on the 9th of August,

1916, conveyed all the property pertaining to the sewer system to the "George West Sewer Company" fully describing it.

Nowhere in the charters of the companies named is there any authority mentioned or method provided whereby the fixing of rates can be established. That question, in so far as the chartered companies are concerned, is left open. Greenville Telephone Co. v. City of Greenville (Tex. Civ. App.) 221 S. W. 997.

It is unfortunate that the deed, in going so much into detail requiring the grantees to take the water, etc., did not provide the method of determining the reasonableness of rates instead of requiring them to go to unknown "authorities 'having 'power to establish such" for their relief. In the situation presented, we only suggested what occurred to us a reasonable alternative in disposing of the troublesome question, but, as that suggestion is not desirable to either party, it is withdrawn, and the matter will be left open on the rate-making question to be determined according to the rules of equitable jurisprudence and law in such cases and as provided for in the conveyance and in accordance with the views expressed herein. In view of the fact that appellees say this court gratuitously declared in their favor without their request, the clause in the deed requiring them to take water from the system shall be of no effect, upon the contingency named, is hereby also withdrawn. That part of the opinion is as follows:

"If the appellants are not then willing to operate the same for such charges, the appellants may with appellees' concurrence take over the same by paying its reasonable value to be determined by a fair commission or committee of experts to fix its value and pay for it and then operate it. If that cannot then be arrived at, then the appellees may remove improvements, and that provision in their deeds requiring them to take water from said system be set aside and held for naught."

[9] We do not think, as appellees contend, only the Legislature can fix these values. We do not deny its power, but it has not acted. We hardly think it has the flexible power to fix from time to time rates. If it had had the flexible rate-making power from time to time to fix rates in every case and in every contingency, Texas Railroad Commission would have never come in power made necessary through an amendment to the Constitution. Certainly this court has no power to fix rates, but may determine as to their reasonableness. In this case, however, we think under the circumstances the trial court has the adequate power to do so. It is held in Ball v. Texarkana Water Corporation (Tex. Civ. App.) 127 S. W. 1071:

"Neither can the courts, under the allegations of appellant's petition, fix a rate for the future government of appellee's business, as is asked to be done in this case. As before stated, this is a legislative, not a judicial, function. Except under conditions well understood, the court has no right to lay hands upon the business of the water corporation, and act in the capacity of a receiver or administrator thereof. * * *

"It does not follow, however, that appellant's petition states no ground for equitable relief. The business of the appellee, water corporation, is of a public nature, or, as commonly expressed, 'affected with a public interest.' Its franchise confers upon it the right to use the streets and public places of the city for laying its pipes and conducting its business. The conferring of this privilege imposes upon it the obligation to serve the public in a reasonable way for a reasonable compensation. It may adopt reasonable regulations for the conduct of its own business; but, subject thereto, it is not optional with it as to whom it shall serve, nor can it arbitrarily demand an unreasonable charge for its service or discriminate in its charges. 'If this were not so, and if corporations existing by the grant of public franchises, and supplying the great conveniences and necessities of modern city life, as water, gas, electric lights, street cars, and the like, could charge any rates, however unreasonable, and could at will favor certain individuals with low rates, and charge others exorbitantly high, or refuse service altogether, the business interests and domestic comforts of every man would be at their mercy. They could kill the business of one, and make alive that of another; and, instead of being a public agency created to promote the public comfort and welfare, these corporations would be the masters of the cities they were established to serve.' Griffin v. Goldsborough Water Co., 122 N. C. 206, 30 S. E. 319, 41 L. R. A. 240. * * * He is not seeking to enforce or make a contract, but to prevent injury to him arising under the duty owing by appellee to furnish water to him at reasonable, and not unreasonable, rates. For these and other allegations, the appellant, upon the face of his petition, was entitled to an injunction preventing the water corporation from cutting off his water supply; and, on final hearing, it was the duty of the court to hear testimony as to what would be a just compensation for such past service, and to then render such decree as the facts and the law should warrant. Griffin v. Goldsborough, supra; Smith v. Birmingham Waterworks Co., 104 Ala. 315, 16 South. 123; City of Mobile v. Water Supply Co., 130 Ala. 379, 30 South. 445; Richmond Nat. Gas Co. v. Clawson, 155 Ind. 659, 58 N. E. 1049, 51 L. R. A. 744; Public Service Corp. v. American Lighting Co., 67 N. J. Eq. 122, 57 Atl. 482; People's Gaslight Co. v. Hale, 94 Ill. App. 406; City of Madison v. Madison Gas Co., supra; 30 Am. & Eng. Ency. of Law, 424; 20 Cyc. pp. 1162, 1165; 2 Beach, Mun. Corp. 834c; 4 Cook, Corporations, par. 931."

See Cleburne Water & Ice & G. Co. v. City of Cleburne, 13 Tex. Civ. App. 141, 35 S. W. 733; Greenville Telephone Co. v. City of Greenville (Tex. Civ. App.) 221 S. W. 997.

We think the very last paragraph of the deed and appellants' mutual obligation will deprive him of the claimed right to remove his system at least until "the authorities

having power to establish such (reasonable) rates from time to time under the law" have failed. It made no difference whether West ever intended he should receive a return on the investment in said water system or not; this does not justify a court of equity to require him to furnish the same at a loss and with a burden to him.

It is the function of the courts to say what are and what are not unreasonable rates. It is apparent that the rates fixed by the receiver are not reasonable, and not fixed by any method known to the law in such cases. The agreement made between the parties upon the representations of appellants that the rates would be as low as any city or town in Southwest Texas not owning its own water and sewer systems, San Antonio and Corpus Christi not excepted, seems to be the only basis agreed upon. This was the finding of the trial court.

Somewhat similar to this case are the facts stated in the case of Cleburne Water Ice & Lighting Co. v. City of Cleburne, 13 Tex. Civ. App. 144, 35 S. W. 734:

"The appellant had charged the citizens higher rates for water than the Bell rates, provided for in the contract; and, in the event of refusal to pay the higher rates, it would have cut off the supply of water. Had the supply been cut off, the citizens would have been damaged; and no remedy existed therefor. In such a contingency, there is 'utter uncertainty in any calculation of damages from the breach of the covenants, and the measure of damages is largely conjectural,' and no full and complete relief could have been obtained in an action at law. The equitable proceeding by injunction, under the facts and circumstances of this case, in our opinion, was the only adequate remedy. School Dist. of Borough of Sewickley v. Ohio Val. Gas Co., 25 Atl. 868; City of Winfield v. Winfield Water Co., 32 Pac. 663.

"3. Do the terms of the contract bind said company to the Bell rates? The wording of that part of the contract that raises this issue is as follows: 'The said S. E. Moss proposes to charge consumers of water the same rates as are now charged at Waco, Tex., by the Bell system of waterworks, or such other reasonable rates as from time to time shall be fixed by the city council of the city of Cleburne; it being expressly understood that the limits of said rates shall not be less than is allowed by cities of like size and population in this state.' The contention of appellant is that 'the Bell rates were not to obtain, except and unless the rates therein set forth and contained should equal the rates charged in cities of like size and population as Cleburne in this state,' while appellee contends that, under the contract, the Bell rates should obtain until changed by the city council, and that no charge greater than the Bell rates was ever to be made. This involves the proper construction to be given to the terms of the contract. We are of opinion that the contract fixes the Bell rates as a basis, and that the company is bound to furnish water at that rate until the city council should fix other reasonable rates; and, in the event the city council saw proper to change the rate, it could not fix a rate less than 'is allowed by cities of like size and population as Cleburne in this state.' From the facts and circumstances, it is evident that the contracting parties intended the Bell rates to prevail unless other cities of the character named fixed the water rate less than the Bell rates, in which case the city council of Cleburne would have the power to change the rates, provided a less rate was not fixed than allowed by such cities. It was not intended that the city council should fix rates higher than the Bell system. This construction, we think, is borne out by the preamble to the second proposition submitted by Moss to the city council, which proposition was accepted and adopted in lieu of the original contract. Said preamble is as follows: 'In view of the fact that objections have been made and are being made by certain people in the city to certain portions of the propositions heretofore made by me, and accepted by your honorable body, and being desirous of retaining as far as possible the good will of the people of Cleburne, I have sought to obviate, as far as possible, those objections, and to that end here submit this as a substitute for said accepted proposition for the purchase of the Cleburne system of waterworks.' This statement does not show the objections urged by 'certain people of the city,' but we find that the terms of the first contract relating to rates to be paid by consumers were changed. The first contract provided that 'said Moss proposes to charge consumers of water the same rates as are now charged at Waco, Tex., by said Bell water system, the rates being the present adopted rates of said system.' In the second contract the other clauses were added to this provision as shown above. We take it this change was made because the people objected to being bound absolutely to the Bell rate, not because the rate was too high at that time, as it was the lowest in the state, but because rates might become still lower, and they were not willing to be bound absolutely by the Bell rates when rates in the future might become less. Hence the provision authorizing the city council to fix rates, with the limitation as to other cities, which limitation was for the protection of Moss against the fixing of rates by the council at less than those of other cities of like character in the state. He evidently was willing to abide by the Bell rates, but, when the council undertook to change, it could not go below other cities of like size and population. Again, about four years after the contract was entered into, the Bell rates were charged, and no change was attempted until a short time before the institution of this suit. While the using of said Bell rates, as stated, is not conclusive, nor would it control the express terms of the contract, yet it is a strong circumstance pointing to the fact that the parties construed the contract in that light. It is a rule of construction that the intention of parties in making a contract will govern, if no violence is done to the express terms of the contract. City of Cincinnati v. Cincinnati Gaslight & Coke Co. (Ohio Sup.) 41 N. E. 239.

"The appellant being bound to supply water at the Bell rates, it is unnecessary for us to consider whether the rates attempted to be charged by it are reasonable or unreasonable. If appellant entered into a bad contract, it must abide thereby; for, in such a case, the courts will afford no redress. Smith v. Water-

'works Co. (Ala.) 16 South. 124. The judgment is affirmed."

[10] And in respect to the receivership the appellee complains now that we did not pass on that question raised by him in his assignments. He has only himself to blame. In his assignments 25, 30, 40, 41, and 42, challenging the ruling of the court on the subject, he raised the question. But in setting out his points for discussion thereunder, no reference whatever is made to any of such assignments. We are now urged to dismiss the receivership. It appears that the receivership was granted without notice, and the property has been in the possession of a receiver and operated by him who was appointed by the court October, 1921, appointed upon the alleged ground that appellants were letting the system fall out of repair, had discharged the mechanic, and that the town was without water. The allegations were found not true by the trial court.

The evidence showed that the plant had always been well cared for by the appellant at a large expense to himself who had always furnished ample water, and that no one had ever been deprived of water, notwithstanding some were in arrears for several months.

We are not willing to give our assent to the appointment of a receiver without notice to take charge of a waterworks system, oust the true owners, and operate it, because of a dispute as to what constitutes a reasonable rate. No amplification of the reasons or citation of authorities are necessary, because it is too obvious in such cases receiverships do not present the remedy. Ball v. Texarkana Water Corporation (Tex. Civ. App.) 127 S. W. 1071.

There is no relief to which appellee may be entitled that they cannot secure by injunction. The appellants' motion to discharge the receivership is therefore granted, and the receivership is dismissed at the costs of appellees, and the receiver directed to restore to appellants the custody of all the property that has come into his possession as such. In all other respects the motion is refused. Likewise we also overrule in toto appellees' motion for a rehearing.